JECKER, TORRE, AND CO., ET AL., CLAIMANTS OF THE CARGO OF THE SHIP ADMITTANCE, AND FESSENDEN AND FAY, CLAIMANTS OF THE SHIP ADMITTANCE, v. JOHN B. MONTGOMERY, LIBELLANT.

In a state of war, the nations who are engaged in it, and all their citizens or subjects, are enemies to each other. Hence, all intercourse or communication between them is unlawful.

Cases mentioned, by way of illustration, in which property of a subject or citizen, found trading with an enemy, has been adjudged to be forfeited as prize.

The interposition of a neutral port through which the property is to pass, does not prevent it from being confiscated.

In the present case, the evidence shows that the owners of the ship and cargo knew that the destination of the voyage was to an enemy's port. Even if the owner of the

vessel was ignorant of it, the fate of the vessel must be decided by the acts of those persons who had her in charge.

It is generally the duty of the captor to send his prize home for adjudication; but circumstances may render such a step improper, and of these he must be the judge. In making up his decision, good faith and reasonable discretion are required. In the present case he was excusable for not sending home the vessel.

Generally, the proceedings for the condemnation of property as prize, ought to be instituted in the name of the United States. The circumstances, which led to the use of the name of the captor, and the fact that no objection was made to it in the court below, prevent this court from pronouncing the objection to be fatal.

The proceeds of sale were properly deposited in the treasury of the United States.

This was an appeal from the circuit court of the United States for the District of Columbia, holden in and for the county of Washington.

The case is stated in the opinion of the court.

It was argued by *Mr. Coxe* and *Mr. Nelson,* for the appellants, and *Mr. Key* and *Mr. Johnson,* for the appellees. The arguments consisted chiefly in comments upon the evidence upon both sides, and, for the appellants, in the legal objection that the libel should have been filed in the name of the United States, instead of an individual.

Mr. Justice DANIEL delivered the opinion of the court.

This is an appeal from a decree in admiralty by the circuit court of the United States for the District of Columbia, by which decree the ship Admittance, claimed by the appellants, Charles B. Fessenden and Richard S. Fay, as owners, and the cargo of the same ship claimed by the appellants, Jecker, Torre and Co. and Manual Quintana, were upon a libel filed by the appellee, John B. Montgomery, condemned as prize of war.

It will serve to explain the nature of the present controversy, and the character of the decree of the circuit court above mentioned, to refer to the proceedings heretofore had therein upon a libel filed by the claimants of the cargo for restitution, and to the decision of this court upon cross-appeals from those proceedings, both by the claimants and the captor, out of which last-mentioned decision the case before us has arisen.

By the decision of this court just referred to, (see 13 Howard, p. 498,) we hold the following propositions to have been expressly ruled:—

1. That the admiralty court of the District of Columbia had jurisdiction of the libel for the condemnation of the property in contest, although such property was not brought within its jurisdiction; and if they found the subject liable to condemnation, might proceed to condemn, although not in fact within the custody or control of the court.

2. That the admiralty court in the District of Columbia, having jurisdiction of the case, it was its duty to order the captors

to institute proceedings in that court to condemn the property as prize, by a day to be named in the order; and in default thereof to be proceeded against upon a libel for an unlawful seizure; because the property of the claimant is not devested by the capture, but by condemnation in a prize court—is not devested until condemnation, though such condemnation will relate back to the capture.

3. That the grounds alleged for the seizure of the vessel and cargo, namely, that the vessel sailed from New Orleans with the design of trading with the enemy, and did in fact hold illegal intercourse with them, are sufficient, if supported by testimony, to subject both vessel and cargo to condemnation.

4. And if they were liable to condemnation, the reasons assigned in the answer for not bringing the vessel and cargo into a port of the United States for trial — namely: that it was impossible so to do consistently with the public interest — is sufficient, if supported by proofs, to justify the captors in selling vessel and cargo in California, and to exempt the captors from damages on that account.

5. That to a libel for restitution, probable cause for seizure is no defence; but is so only against a claim for damages, in cases in which the property has been restored or lost after seizure.

Under the authority of the rulings just enumerated, and in obedience to the mandate founded thereupon, the libel in the cause now before us was filed; and the case made by the parties presents, as the material questions for consideration, the inquiries; 1. Whether the vessel sailed with the design of trading with the enemy, and did in fact hold illegal intercourse with them. 2. Admitting that the vessel and cargo were in the first instance liable to condemnation, whether the reasons assigned for not bringing them within the United States were so supported by proof, as to justify the captor in not bringing them within the United States, and in selling them in California, without a forfeiture of their rights as captors.

As a principle applicable to the first of these inquiries, it may be averred as a part of the law of nations — forming a part, too, of the municipal jurisprudence of every country — " that in a state of war between two nations, declared by the authority in whom the municipal constitution vests the power of making war, the two nations and all their citizens or subjects are enemies to each other." The consequence of this state of hostility is, that all intercourse and communication between them is unlawful. *Vide* Wheaton on Maritime Captures, cap. 7, p. 209, quoting from Bynkershoeck this passage: " *Ex natura belli commercia inter hostes cessare, non est dubitandum. Quamvis nulla specialis*

*sit commerciorum prohibitio, ipso tamen jure. belli, commercia
inter hostes esse vetita, ipsæ indictiones bellorum satis declarant.*

Upon this principle of public law, it has been the established
rule of the high court of admiralty in England, that a trading
with the enemy, except by a royal license, subjects the property
to confiscation. The decisions of that court show that the rule
has been rigidly enforced, as, for instance, where the government
had authorized a homeward trade from the enemy's possessions,
but had not specifically protected an outward trade to the same;
and again, in instances where cargoes have been laden before
the war, but where the parties had not used all possible diligence
to countermand the voyage after the first notice of hostilities;
and this rule has been enforced, not only against subjects of the
Crown, but likewise against those of its allies in the war, upon
the assumption that the rule was founded on the universal
principle which states allied in war had a right to apply to each
other's subjects. *Vide* Wheaton on Captures, p. 212; and 1
C. Robinson's Adm. R. 196, The Hoop.

The same rule has been adopted with equal strictness by this
court. In the case of The Rapid, reported in 8 Cranch, 155,
the claimant, a citizen of the United States, had purchased
goods in the enemy's country a long time before the declaration
of war, and had deposited them on an island near the boundary
line between the two countries. Upon the breaking out of hos-
tilities, his agents had hired the vessel to proceed to the place
of deposit and bring away these goods. Upon her return the
vessel was captured, and, with the cargo, was condemned as
prize of war for trading with the enemy. In applying the law
to this state of facts, this court said, and said unanimously;
" That the universal sense of nations has acknowledged the
demoralizing effects that would result from the admission of in-
dividual intercourse. The whole nation are embarked in one
common bottom, and must be reconciled to submit to one com-
mon fate. Every individual of the one nation must acknowl-
edge every individual of the other nation as his own enemy,
because the enemy of his country. But, after deciding what is
the duty of the citizen, the question occurs, what is the conse-
quence of a breach of that duty? The law of prize is a part of
the law of nations. In it, a hostile character is attached to
trade, independently of the character of the trader who pursues
or directs it. Condemnation to the use of the captor is equally
the fate of the property of the belligerent and of the property
engaged in anti-neutral trade. But a citizen or an ally may be
engaged in a hostile trade, and thereby involve his property in
the fate of those in whose cause he embarks." Again, the court
say: " If by trading, in prize law was meant that signification

of the term which consists in negotiation or contract, this case would not come under the penalties of the rule. But the object and spirit of the rule is to cut off all communication or actual locomotive intercourse between individuals of the belligerent nations. Negotiation or contract, has, therefore, no necessary connection with the offence. Intercourse inconsistent with actual hostility is the offence against which the operation of the rule is directed."

The case of The Joseph, reported in 8 Cranch, p. 451, was that of a vessel owned by citizens of the United States, that sailed from thence before the war, with a cargo on freight on a voyage to Liverpool and the north of Europe, and thence back to the United States. After arriving and discharging her cargo at Liverpool, she took in another at Hull, and sailed for St. Petersburg. At St. Petersburg, she received news of the war with England, and sailed to London with a Russian cargo consigned to British merchants; delivered her cargo and sailed for the United States in ballast, under a British license, and was captured. In the opinion of this court in this case, delivered by Washington, Justice, it is said: " That after the decision in the cases of The Rapid and of The Alexander, it is not to be contended, that the sailing with a cargo on freight from St. Petersburg to London, after a full knowledge of the war, did not amount to such a trading with the enemy as to have subjected both the vessel and cargo to condemnation as prize of war, had she been captured on that voyage. The alleged necessity of undertaking that voyage to enable the master out of the freight to discharge his expenses at St. Petersburg — countenanced, as the master declares, by the opinion of our minister at St. Petersburg, that by undertaking such a voyage he would violate no law of the United States — although these considerations, if founded in truth, present a case of peculiar hardship, yet they afford no legal excuse which it is competent to this court to admit as the basis of its decision."

The same course of decision which has established that property of a subject or citizen taken trading with the enemy is forfeited, has decided also that it is forfeited as prize. The ground of the forfeiture is, that it is taken adhering to the enemy, and therefore the proprietor is *pro hac vice* to be considered as an enemy. *Vide* also Wheaton on Captures, p. 219, and 1 C. Robinson, 219, the case of The Nelly.

Attempts have been made to evade the rule of public law, by the interposition of a neutral port between the shipment from the belligerent port and their ultimate destination in the enemy's country; but in all such cases the goods have been condemned, as having been taken in a course of commerce rendering them

liable to confiscation; and it has been ruled that, without license from government, no communication, direct or indirect, can be carried on with the enemy; that the interposition of a prior port makes no difference; that all trade with the enemy is illegal, and the circumstance that the goods are to go first to a neutral port will not make it lawful. 3 C. Robinson, 22, The Indian Chief; and 4 C. Robinson, 79, The Jonge Pieter.

Having thus stated the law with regard to maritime captures, it remains to be ascertained how far the case before us upon the pleadings and proofs, falls within the scope or the terms of that law.

The libel propounds, that the libellant, as the commander of the United States ship Portsmouth, did, on the 7th of April, 1847, at the port of San José in lower California, in the Republic of Mexico, seize and take possession of as lawful prize, a certain ship or vessel called The Admittance,—one Peter Peterson being the master—with her cargo, provisions, tackle, and all other appurtenances to the said ship belonging. That the said ship is a merchant vessel belonging to citizens of the United States, and that the cargo of said ship is believed by the libellant to have belonged to certain merchants resident in Mexico. That about the month of October, 1846, the said ship with her cargo, left the port of New Orleans for a port in the Republic of Mexico, into which port the captain intended to discharge the cargo. That for some time prior to the sailing of this ship, and upon the day of her seizure, open and public war existed between the United States and the Republic of Mexico and its dependencies. That in consequence of said state of war, and in discharge of his duty, the ship Admittance, with her cargo, was seized by the libellant as prize of war.

The libellant further propounds, that Peterson, as master of the said ship, did sail from the United States with the intention of trading, and in fact did trade and otherwise hold illegal intercourse with the enemies of the United States, whereby the said ship, her cargo, tackle, and appurtenances, became subjects of lawful prize. All which illegal intention and acts of the master more fully appear by the papers of the said ship, and by other papers received from the master by the libellant, numbered from one to fifteen inclusive; from the deposition of William Bell, the first mate of The Admittance, and from the log-book —all of which it is prayed may be made parts of the libel; which concludes with a prayer for condemnation of ship and cargo, and for the dismission of the libel previously filed by Torre, Jecker, and Co., praying restitution of a portion of the cargo.

To the libel of Captain Montgomery were filed an answer on

behalf of Fessenden and Fay, who intervened as owners of the
ship, and separate answers on behalf of Jecker, Torré, and Co.,
and of Manuel Quintana, as owners of the cargo.

These answers, so far as they are made up merely of general
denials of the charges propounded in the libel, require no special
animadversion. So far, however, as the specific facts alleged in
them by way of exculpation, the compatibility of those facts
with the established law of prize, or with the proofs adduced in
the case, become a question, the statements in these answers
are matters of essential importance, requiring particular exam-
ination.

The respondents Fessenden and Fay, have in their answers
observed an entire silence with respect to a knowledge on their
part as to the destination of the ship or cargo; whilst they are
very explicit in the assertion of their belief, that the cargo was
put on board by the charterer, and that the ship sailed under a
full persuasion that a treaty of peace would speedily terminate
the then existing war between the United States and Mexico,
and that they never were informed, nor do they believe, that the
cargo was to be landed or disposed of in Mexico until after the
termination of the war. Personally they say, that they know
nothing of what occurred in relation to the ship and cargo in
the Pacific; but from what they have learned they believe, and
therefore aver, that there was no trading with the enemy at any
time during the voyage. This statement which implies knowl-
edge in the respondents of the existence of war between the
United States and Mexico at the time of chartering of their ship,
and knowledge likewise that the cargo put on board was des-
tined for the port of a nation, at the time of the shipment at any
rate, in open hostility with the United States, will, as to its
verity, be further tested by a comparison with the testimony
furnished by the papers found in the captured vessel and by the
examination of witnesses. And in this connection it may be
observed, that the bare permission by the owners of the use of
their vessel in hostile or piratical enterprises, renders such vessel
liable to capture and condemnation equally with her employ-
ment in similar offences under the immediate command of such
owners themselves. *Vide* the case of The United States *v.* The
Brig Maleck Adel, 2 How. 234; The United States *v.* The
Schooner Little Charles, 1 Brok. Rep. 347; The Palmyra, 12
Wheat. 14; 1 C. Rob. R. 127; The Vrow Judith.

Comparing this answer with the papers found on board the
captured vessel, we see it expressly stipulated in the charter-
party, the very contract by which the ship was hired, and which
was signed by these respondents, that the ship shall proceed to
New Orleans, and there take from the charterers Wylie and

Ygana, 1,100 bales of cotton, to be delivered at the port of San Blas to the order of the shipper, the consignee paying freight for the room occupied in the ship by the cotton, eleven hundred dollars, payable on delivery of the cargo; the cargo to be received at New Orleans and discharged at San Blas with dispatch. The charter-party further provides, that if on the arrival of the ship off San Blas, the port is blockaded, or other obstructions prevent the discharge of the ship, she shall proceed to the Sandwich Islands, and there remain until the port is open, the said Wylie and Ygana paying in addition to the charter the further sum of one thousand dollars per month during such detention. We will hereafter state what is conceived by this court to be the proper construction of this phrase, "if the port is blockaded, or other obstructions prevent the discharge of the ship." Independently of this phrase, however, we have, on the face of this contract, the declaration that the shipment was made to an enemy's port; that the delivery was to take place at that port; that the interposition of the neutral island of Honolulu was not for the purpose of trade with, or transshipment at that island, but solely for the purpose of affording an opportunity to enter into and discharge at a port known to be an enemy's port, in which the consignees of the cargo resided, and the delivery at which port was made a precedent and necessary condition to the payment of freight.

Upon a comparison of the bill of lading with the charter-party, the *terminus* of the voyage and the destination of the cargo are more clearly shown. The language of the bill of lading runs thus: " Shipped in good order and well conditioned, by Wylie and Ygana, on board the good ship Admittance, whereof is master for the present voyage Peterson, and now lying at New Orleans, and bound for Honolulu, two thousand seven hundred and seven small bales of cotton, being marked and numbered as in the margin, and are to be delivered." Where ? Not at Honolulu, where there was no consignee, apparent or mentioned—not at San Blas, as an incidental point in the track of the voyage to Honolulu, but at " the aforesaid port of San Blas," the predetermined limit of the voyage, and to Don Lewis Rivas Gongora, resident at San Blas, the correspondent and consignee of the shipper.

Taking, in connection with the charter-party and the bill of lading, the instructions from the respondent, Fessenden, to the master of the ship before sailing from New Orleans, it seems almost incredible that the owners should have been ignorant of the character of the voyage, and of the hazards incurred by their vessel resulting from that character. How, upon any other view, can be accounted for the extreme caution enjoined upon the

master with respect to the danger of entering a Mexican port—danger expressly distinguished from that arising from the probability of capture by vessels of the United States; such as it is said might arise from the disposition of the Mexican government, under the plea of the right of war to confiscate the vessel, notwithstanding the consignees might have obtained permission to land the cargo?　It is absurd to suppose that this caution could have had any possible reference to a state of reëstablished amity between Mexico and the United States, as the vessel of a friendly nation could incur no risk of confiscation by entering the port of a friend.　We think that it was to dangers and hazards which might proceed from the Mexican authorities—hazards and dangers incident to an existing and known state of war, which were in the contemplation of the owners when, in the charter-party, they speak of "other obstructions," (beyond that of blockades,) "which might prevent the discharge of the ship at San Blas," an enemy's port.　This interpretation of the conduct and purposes of the owners and charterers is strongly corroborated by, and explains that portion of the instructions to the master which tells him, "you will perceive from this that you must be very cautious about going into a Mexican port, for, although the consignees may have authority to land the cotton, yet they might seize the vessel after being discharged, unless the vessel as well as the cargo had permission from the Mexican government." This language would be unintelligible, unless it had reference to a known belligerent attitude of the two nations, forbidding intercourse or traffic between their respective citizens, and to a contemplated dispensation from the existing prohibitions by one of the belligerents.　We are, therefore, upon a just construction of the answer of the claimants of the vessel, of the charter-party signed by them, of the bill of lading, and of the instructions to the master, impelled to the conclusion, that these claimants of the vessel were aware of the character of the voyage for which they had hired her, and were willing, nevertheless, to incur the hazards of the enterprise in consideration of the profits it promised them.

Looking next beyond the evidence of intention and knowledge as deducible from the ship's papers proper, to the acts of the master in execution of the objects and purposes of the voyage, the following facts are shown by the testimony of the witnesses, Bell, Martin, and Graves, all of them belonging to the crew of The Admittance, and the first-named being the mate of the ship: That she sailed directly to San Blas; that upon her arrival off this port, then being an enemy's port, and in the possession of the enemy, she remained before it three days and nights, during which time the master opened an intercourse with the port,

receiving at different times communications therefrom, to which he replied; that whilst off San Blas the captain showed no American ensign, but after receiving the communications from the shore, he ordered the chief mate not to head the log-book, and also directed the concealment of the ship's name by covering her stern with painted canvas, and proceeded along the coast as far as 188 north, looking for some bay or inlet on the coast of Mexico where the cargo might be delivered; but finding no suitable place, the ship was headed for San José, California. It is further proved by the witnesses, Mesroon and Bell, that The Admittance entered the port of San José before it was captured by the forces of the United States, and when it was still a Mexican port, in the possession of the enemies of the United States; and the witnesses, Bell and Graves, both of the crew of The Admittance, swear that the captain, before the seizure, landed goods at this hostile port. Upon every correct view, then, of the facts of this case, and of the law of prize as applicable to these facts, it is clear that the ship Admittance was properly subject to seizure and condemnation as prize of war.

We have seen, by the authorities cited, that intercourse with the enemy is sufficient cause for personal punishment, and for the confiscation of property; that it is a cause originating in, and inflexibly enforced by necessity for guarding the public safety. In this cause are established against the claimants of this vessel, not only intercourse, but trading, in its common acceptation. Moreover, it is a settled principle, that if the owners had not anticipated a violation of the public law, the fate of their vessel, with respect to an infraction of that law, must depend upon the conduct of the agent with whom they have entrusted its management.

With respect to the respondents, Jecker, Torre, and Co., and Quintana, claimants of the cargo, the written documents found on board the captured vessel, and surrendered to the libellant by the master, fasten upon these claimants not only a knowledge of the design, under the pretext of a voyage to the Sandwich Islands, of trading with citizens of the United States, a belligerent nation, but they fix upon those parties strenuous and active efforts to possess themselves of the fruits of that traffic—the cargo of the ship; and to obtain them, not even by the circuitous voyage to Honolulu, but by direct transit to and within the territory of the enemy's nation. It is a circumstance of much significance disclosed by these papers, that there appears to have existed a perfect understanding and preconcert between these claimants, the charterers of the vessel, and the master. The arrival of the master is anticipated and waited for, and no

sooner does his vessel appear on the Mexican coast, (the war still continuing,) than she is boarded from the shore by the agents of the claimants, bringing assurances of arrangements made for the violation of the law of war, and of the safety with which that violation might be accomplished.

Thus, on the 12th of February, 1847, a letter, from which the following extracts are taken, was addressed by the agent of the claimants, Jecker, Torre, and Co., Louis Rivas Gongora, to the master of The Admittance :—

"CAPT. P. PETERSON, Ship Admittance, off San Blas.

"SIR: I have been informed of your sailing from New Orleans with a cargo of cotton to my consignment, and have also received a copy of Messrs. Wylie and Ygana's instructions for your guidance; also a copy of your charter-party. But as it will be more for the convenience of all parties concerned, that in case of your not being allowed by the blockading vessels to enter San Blas or Manzanilla, you should not proceed to the Sandwich Islands, which are very distant, but in the first place to San José near Cape San Lucas, which is in possession of the Americans, I have to request that if you find the port of San Blas blockaded, and should be warned off, you will, as is directed in your instructions, proceed to Manzanilla, where, if you are allowed to enter, you will find an agent meeting you there, who will receive your cargo. If San Blas is open when you arrive, you will come into the bay immediately and anchor, putting yourself under the orders of Don Eustaquio Pasiere, who will proceed to discharge your cargo; and as it is of much importance that the cotton should be on shore as soon as possible, I hope you will do every thing on your part to commence and to finish discharging with the least possible delay. If you are permitted to enter San Blas or Manzanilla, you must come in under British colors, the name of the vessel and your own remaining without alteration, still reporting yourself from New Orleans; but you will be careful not to deliver any of the papers of the ship or cargo to any one except to Don Eustaquio Pasiere."

Again, on the 27th of the same month, this person thus addresses the master from Tepic :—

"CAPT. P. PETERSON, Ship Admittance, off San Blas.

"SIR: I had the pleasure to write to you on the 12th of this month, which will be delivered to you along with this. But as at present certain circumstances have taken place which, I think, make it too dangerous for you to come into San Blas, I have to request that you will proceed immediately to Manzanilla, and

put yourself under the orders of Don Manuel de la Quintana, who has gone to meet you there, and who will deliver to you a letter, authorizing him to act as your consignee. He will discharge your vessel, pay your freight, and transact all the business of your vessel the same as if I was present. You will please enter Manzanilla under English colors, and, as the war continues, you will take care that it shall not be known that your vessel is American."

In proof of the agency of Rivas, as the representative of Jecker, Torre, and Co., and as affecting them by his acts, reference may be made to a communication from that firm, dated Mazatlan, April 1, 1847, addressed to the master of The Admittance, which communication was doubtless prepared on entire ignorance of the seizure of that vessel, which had occurred only three days previously at San José. In this communication it is said : " Should this find you at San José, we have to request you to proceed at once to San Blas, referring you at the same time to the accompanying letter for you from Don Luis Rivas de Gongora, of Tepic. Mr. Rivas has furnished us with copies of your letters to him, of the dates of the 3d and 4th of March, by which it appears you entertain fears of being seized by an English or American cruiser should you follow his recommendation to discharge under English colors." They then refer the master to Mr. Mott and Mr. Bolton, for assurances that his apprehensions are groundless, and state, " that in less than a month previously an American vessel discharged at San Blas without let or hindrance ; that the difficulty with regard to the vessel in a Mexican port had been overcome by an order of the supreme government, by which vessels of any nation were permitted to enter, provided that the captain would make a declaration to the effect that he belonged to a friendly or neutral nation, no papers confirming that assertion being required of him."

We think, then, that by the evidence found in the possession of the master of The Admittance, there is shown a complicity in all the respondents in premeditating, and as far as they had power in executing, a scheme for effecting intercourse and trade with the open enemies of the United States—an offence such as rendered all the means and instruments for the accomplishment of such a scheme lawful prize of war.

But it has been insisted, that should it be conceded that there existed originally sufficient grounds for capture and condemnation, still, the captor had forfeited all right of prize by omitting to send the vessel and cargo to the United States for adjudication, and by selling them without the justification of necessity in a foreign country. The libellant has alleged, in justification

of the disposition of the vessel and cargo, " that he was at the time of the capture of The Admittance at a great distance from the United States, and, without weakening inconveniently the force under his command in his own ship, he could not have spared a sufficient prize crew and officers to command the captured ship, and to bring her into the United States."

The exception here taken brings up the inquiry, as to the duty and power of a captor to send in his prize for adjudication, and as to the discretion vested in him in deciding upon the extent of that duty, and the feasibility of that power under existing circumstances. This inquiry has been treated with so much force and perspicuity by Mr. Justice Curtis, in a case adjudged by him between a portion of these respondents as claimants of the ship, and the libellants, that it cannot be more clearly and at the same time more succinctly elucidated than it will be by reference to the opinion of that judge in the case alluded to, (vide Fay et al. v. Montgomery, 1 Curtis's R. 266.) In that case, the judge remarks : " The grounds on which restitution is claimed are thus stated in the libel, 'that the seizure and detention were without any legal, justifiable, reasonable, or probable cause ; and even if there had been probable cause for the seizure of the said vessel, the said Montgomery was legally bound to send the same to the United States for trial, which might easily have been done, but which the said Montgomery illegally and unjustifiably omitted to do, and thereby illegally converted the same to his own use.' Here (says the judge) are two distinct grounds : the first being that the seizure was an act of illegal violence ; and the second, that, by not sending the vessel to the United States for trial, the respondent had illegally converted it to his own use." After commenting upon the evidence which led his mind to the conclusion that there was properly a question of prize to be tried, the judge remarks : " And this brings me to consider the other ground stated in the libel, that by his omission to send the vessel to the United States for trial, the respondent illegally converted the vessel to his own use. That captors may so act towards prize property as to forfeit their rights as captors, and render themselves liable to make restitution, with or without damages, is clear. But before the court can so declare, a case of forfeiture of rights, free from all reasonable doubt, must be made out. In considering this part of the case, the question is, whether the allegation that the respondent omitted to send the vessel to the United States for trial, when he could safely and properly have done so, and thereby illegally converted the property to his own use, is made out in proof." The answer of the respondent to this part of the libel states : " That it was impossible for him, consistently with the public interests committed to his direction,

to have sent the ship Admittance to any port of the United States." The judge proceeds to say : " Before considering the facts upon which the forfeiture is asserted, one principle should be stated, which is entitled to an important effect on this part of the case. It is, that an honest exercise of discretion, necessarily arising out of his command, cannot be treated as such misconduct in the commander of a public ship of war, as will forfeit his fair title, and render him liable to be treated as a trespasser. This principle is too obviously just to require the support of authority; but it will be found to have been laid down and applied in the case of Dinsman v. Wilkes, in 12 How. 390.

" Now it must be admitted, that the question whether the necessities of the public service will allow the commander of a ship of war, in time of war, upon a remote station on the other side of the globe, to spare one of his officers to go home in command of a prize, is one depending on his discretion, necessarily arising out of his command. In the first instance, he alone has the power to decide the question—he alone has the needful knowledge of facts, and he is bound to exercise his judgment upon them. Certainly his judgment is not conclusive—good faith and reasonable discretion are requisite ; but it would not only be a hardship, but injustice, to impose on the commander the duty of determining such a question, and, when he has determined it, to attribute to him as an act of misconduct that he did not come to a different conclusion. It is true, that it is a clear duty of a commander to send in his prize for adjudication, but this is not an absolute obligation. It depends on his ability to perform it ; and of this, as already said, he must judge in the first instance ; and if he decides with reasonable discretion and an honest purpose to do his duty, I cannot consider him as guilty of misconduct which works a forfeiture."

The judge then, after an examination of the proofs in the case, and of the law as above expounded by him, comes to the following conclusion : " Keeping these principles in view, I am not satisfied that, in omitting to send the vessel to the United States, Captain Montgomery violated any known duty, or acted with so little discretion as to render him liable as a trespasser." And he closes his review of the evidence with this very forcible view of its just import and character : " One of the lieutenants of The Portsmouth was serving on shore—two only remained ; and it does not appear that a single passed-midshipman was on board. Lieutenant Revere [one of the remaining lieutenants on board] has given an opinion—no doubt an honest one,—that he might have been spared ; but it is an opinion formed under no responsibility of command ; and I am not prepared to say that a sloop of war on that coast, at that time, officered by only

two lieutenants, ought to have been left with only one, in order
to send home a prize—and still less, that the commander erred
so grossly, in not detaching this officer on such service, as to
forfeit his legal rights thereby."

The facts which are applicable to this part of the case now
before us, are essentially, if not literally, those adduced in the
trial before the judge whose opinion has been just quoted; and
the very clear exposition of those facts, with the legal deduc-
tions from them, as set forth in that opinion, command our
entire approbation, and are regarded as conclusive against the
appellants upon the question of forfeiture by the appellee of his
right of prize.

Another exception urged in the argument as fatal to the decree
of the circuit court demands our notice, and it is this: That the
proceedings instituted in the district court for the condemnation
of the vessel and cargo as prize of war were in the name of the
libellant, the captor, whereas they should have been commenced
and prosecuted in the name of the United States. This irregu-
larity, for such it must be admitted to be, may have proceeded
from a misapprehension of the opinion of this court in the case
of Jecker, Torre and Co. *v.* Montgomery; (see 13 How. 498;) in
which opinion it is stated to be the duty of the district court to
order the captor to institute proceedings in that court for the
condemnation of the property as prize of war, by a certain day
to be named by the court. The exception thus urged is not
raised in the answers or in any other form of pleading in the
court below. The parties have gone to trial upon allegations
connected with the merits, and upon such testimony as they
have chosen to introduce. It would seem to be a sufficient
answer to this exception to say, that after its waiver or after an
omission to urge it in the court below, and after going into an
extended range of testimony as applicable to the merits of the
case, to permit an exception entirely distinct from the merits, in
the appellate court, would be extending an improper license to
the party starting such exception, and might be productive of
injustice to his opponent. The exception is unquestionably
technical or formal. It embraces neither the question of power
of the captor to seize, nor that of the character of the subjects
of capture as lawful prize of war. Moreover, this exception, if
allowable, would seem to have no other object or purpose, but that
of securing the ends which the proceedings and decree of the
court have in fact accomplished; for it is seen that the libel,
though filed in the name of the captor, was founded upon the
public authority of the United States, and the decree pro-
nounced in the case is in favor and in the name of the govern-
ment, by whom it is shown the proceeds of the condemned

subject have been actually received. It is plain, therefore, that every purpose which the most formal proceeding could have effected, and nothing beyond this, has been accomplished by the decree in this case; and the proposal now pressed upon the court is, that in virtue of a formal exception, which either has been waived or omitted in the proper time and place, the merits of this controversy voluntarily submitted, and fully examined, should be entirely lost sight of, and that the party who alone, within the purview of the exception itself, could regularly claim the subject of the controversy, should for the mere form be required to surrender that subject. Such a proposal should be regarded as neither equitable nor reasonable, and should be especially discountenanced by a tribunal which acts upon principles of an enlarged public policy—less fettered perhaps than any other by narrow technical rules.

This case bears a strong resemblance to that of Benton *v.* Woolsey and the Bank of Utica, reported in 12 Pet. 27, in which the district attorney of the United States filed an information in his own name, in behalf of the United States, in the district court for the northern district of New York, to enforce a mortgage given to the United States by Woolsey one of the defendants. This court in that case hold this doctrine: "Some doubts were at first entertained by the court whether this proceeding could be sustained in the form adopted by the district court. It is a bill of information and complaint in the name of the district attorney, in behalf of the United States. But on carefully examining the bill, it appears to be in substance a proceeding by the United States, although in form it is in the name of the officer; and we find that this form of proceeding in such cases has been for a long time used without objection in the courts of the United States held in New York, and was doubtless borrowed from analogous cases in the courts of the State where the State was plaintiff in the suit. No objection has been made to it either in the court below or in this court, and we think that the United States may be considered as the real party, although in its form it is the complaint of the district attorney."

The objection which has been made to the deposit in the treasury of the money arising from the sale of the captured property in this case, appears to be without weight. Since the act of congress of the 3d of March, 1849, it appears to be the intention and the positive mandate of congress, that all prize money arising from captures by vessels of the navy of the United States, whether received by marshals for the sale of prizes, or in the hands of prize agents, should be deposited in the treasury of the United States. *Vide* § 8th of the act, Stats. at

11*

Large, vol. ix. p. 378.  It does not clearly appear in whose hands the proceeds of the sale of The Admittance and her cargo were at the date of the above statute.  But if they were in the possession of Captain Montgomery at or after that time, either as captor or prize-master, or whether they were in the hands of any other person, it was within the scope and objects of the law to place the proceeds of the prize sale in the treasury of the United States; and accordingly it is shown by the certificate of the treasurer of the United States, that the sum of sixty-seven thousand dollars, as the proceeds of the sale of The Admittance, were on the 26th of December, 1849, by William Speiden, purser of the navy of the United States, deposited in the treasury of the United States.

Upon a consideration of the facts and the law of this case, we are of the opinion that the decree of the circuit court be affirmed.