**ALLEN et al. v. MARKHAM, Alien Property Custodian.**

No. 10760.

Circuit Court of Appeals, Ninth Circuit.
May 22, 1946.
Rehearing Denied July 17, 1946.

S. C. Masterson, of Richmond, Cal. (Matt Wahrhaftig, of Oakland, Cal., and Joseph Genser, of Richmond, Cal., of counsel), for appellants.

John F. Sonnett, Asst. Atty. Gen., Frank J. Hennessy, U. S. Atty., of San Francisco, Cal., Harry LeRoy Jones and M. S. Isenbergh, Sp. Assts. to Atty. Gen., and David Schwartz, Chief Trial Atty., Dept. of Justice, and Wallace H. Walker, Atty., Alien Property Unit, War Div., Dept. of Justice, both of Washington, D. C., and Arthur J. DeLorimier, Asst. U. S. Atty., of San Francisco, Cal. (Raoul Berger, Gen. Counsel to Alien Property Custodian, of Washington, D. C., of counsel), for appellee.

Robert W. Kenny, Atty. Gen., of California, and Everett W. Mattoon, Deputy Atty. Gen., for Attorney General of California, as amicus curiæ.

Before GARRECHT, STEPHENS, and WILBUR, Circuit Judges.

WILBUR, Circuit Judge.

This is an appeal from a judgment of the United States District Court of the Northern District, Southern Division of California, entered upon the pleadings. The action was brought by the Alien Property Custodian against six American heirs at law of Alvina Wagner, deceased, residents of California, who are appealing from the judgment against them. The controversy is over the right to the property left by Alvina Wagner, a resident of San Francisco, California, citizenship not alleged, who died June 6, 1942 in San Francisco, leaving real and personal property in California, which she devised and bequeathed, share and share alike, to her four relatives, who were residents and citizens of Germany, consisting of two brothers, a sister and a niece. The American heir claimants who were disinherited consisted of three nephews and three nieces. The will had no residuary disposal. The Alien Property Custodian claims that the will of the testatrix upon her death vested the property of the deceased in the German devisees and legatees named in the will, while the disinherited heirs claim that the will is ineffective because of the alienage of the non-resident devisees and legatees. In short the appellants claim the property under the laws of succession of the State of California wherein the property is located, while the Alien Property Custodian claims that under the laws of the United States the property has vested in him. The Alien Property Custodian contends that the California Statute, Chapter 895, California Statutes of 1941, Probate Code, §§ 259, 259.1, 259.2, which the California heirs rely upon, is void because in conflict with the Constitution of the United States in that it invades the field of foreign relations and war powers of the United States. The appellants on the other hand contend that Article IV of the German American Treaty of 1925 upon which the Alien Property Custodian relies was abrogated or suspended by the war with Germany, and also by the very same laws and proclamations upon which the Alien Property Custodian relies for his title.

The estate of the deceased herein involved is in due course under probate in the Superior Court in and for the City and County of San Francisco, California, wherein the will of the decedent has been probated and a proceeding in rem has been instituted by the California heirs to determine "who are entitled to distribution of the estate" in which "any person may appear and file a written statement setting forth his interest in the estate." When this suit was instituted in the District Court, the California heirs claims that the California court sitting in probate had exclusive jurisdiction of the matter. The District Court sustained its jurisdiction, Crowley v. Allen 52 F.Supp. 850, and without consideration of the merits of the case we reversed the District Court. 147 F.2d 136. On certiorari, the Supreme Court sustained

the jurisdiction of the District Court, 66 S. Ct. 296, on the ground that the action was one of a kind within the equity jurisdiction of the English Court of Chancery in 1789, and hence was vested in the District Court by the Judiciary Act of 1789, now Judicial Code, § 24(1) thereof, 28 U.S.C.A. § 41(1), giving equity jurisdiction to the District Courts, and also by a special provision in the Trading with the Enemy Act, § 17, 50 U.S.C.A.Appendix, § 17, giving such jurisdiction in matters arising under that Act.

The case was remanded to this court for decision upon the merits. A further statement of the admitted facts and of the proceedings involved in the controversy is necessary. In 1923, a treaty between the United States and Germany was negotiated and signed which was ratified and made effective on October 14, 1925. This treaty contained an agreement relating to reciprocal rights to inherit or take real and personal property of a decedent. (Treaty Article IV.)[1] These provisions conformed in a general way to the provisions of the Treaty of 1828 with Prussia, 8 Stat. 378, 384, before World War I and to treaties entered into by the United States with other powers.[2]

The conduct of the parties to the earlier treaty of 1828, during and after World War I is relevant to the interpretation of the similar treaty of 1925 under the conditions of World War II; hence we state additional facts concerning World War I and its aftermath. On July 2, 1921, after the Armistice of November 11, 1918, but while we were still in a state of war with Germany, Congress passed a joint resolution (42 Stat. 105, 106), providing that property of Germany or German Nationals seized or held or demanded by the United States or its officers on or after April 6, 1917 and similarly of Austria-Hungary on and after December 7, 1917, should be retained until disposed of as provided by law.[3]

This was followed by the Treaty of Ber-

[1] The Trading with the Enemy Act, 40 Stat. 411 enacted in 1917 was amended in 1918, 40 Stat. 459, 460, in 1919 by 41 Stat. 35, 36, in 1920 by 41 Stat. 977, on May 7, 1940, 54 Stat. 179, on December 18, 1941, 55 Stat. 839.

The Treaty of 1925 with Germany, see 44 Stat. 2132, and Article IV thereof at page 2135; the Treaty of 1921 with Germany, see 42 Stat. 1939.

[2] Article IV of the Treaty of 1925 reads: "Where, on the death of any person holding real or other immovable property or interests therein within the territories of one High Contracting Party, such property or interests therein would, by the laws of the country or by a testamentary disposition, descend or pass to a national of the other High Contracting Party, whether resident or non-resident, were he not disqualified by the laws of the country where such property or interests therein is or are situated, such national shall be allowed a term of three years in which to sell the same, this term to be reasonably prolonged if circumstances render it necessary, and withdraw the proceeds thereof, without restraint or interference, and exempt from any succession, probate or administrative duties or charges other than those which may be imposed in like cases upon the nationals of the country from which such proceeds may be drawn.

"Nationals of either High Contracting Party may have full power to dispose of their personal property of every kind within the territories of the other, by testament, donation, or otherwise, and their heirs, legatees and donees, of whatsoever nationality, whether resident or non-resident, shall succeed to such personal property, and may take possession thereof, either by themselves or by others acting for them, and retain or dispose of the same at their pleasure subject to the payment of such duties or charges only as the nationals of the High Contracting Party within whose territories such property may be or belong shall be liable to pay in like cases."

[3] "Sec. 5. All property of the Imperial German Government, or its successor or successors, and of all German nationals which was, on April 6, 1917, in or has since that date come into the possession or under control of, or has been the subject of a demand by the United States of America or of any of its officers, agents, or employees, from any source or by any agency whatsoever, and all property of the Imperial and Royal Austro-Hungarian Government, or its successor or successors, and all the Austro-Hungarian nationals which was on December 7, 1917, in or has since that date come into the possession or under the control of, or has been subject of a demand by the United States of America or any of its officers, agents, or employees, from any source or by any agency whatsoever, shall be retained by

lin of 1921 which expressly ratified and adopted the provisions of the joint resolution of July 2, 1921, supra. The Treaty of Versailles, section 289, also provided for revival of pre-war treaties at the option of the victorious powers. Later, the Supreme Court in the case of Cummings v. Deutsche Bank, 1936, 300 U.S. 115, 57 S.Ct. 359, 81 L.Ed. 545, held that by reason of the first World War and the joint resolution of Congress of 1921, supra, and the Treaty of Berlin ratifying the resolutions and the seizure of enemy property, the United States had become the absolute owner of the seized property of Germany and of German nationals.[4]

On July 28, 1941, the California legislature enacted a statute providing that the right of an alien nonresident to succeed to the property of a deceased person depended upon a reciprocal right in United States citizens.[5] At that time the German-Ameri-

the United States of America and no disposition thereof made, except as shall have been heretofore or specifically hereafter shall be provided by law until such time as the Imperial German Government and the Imperial and Royal Austro-Hungarian Government, or their successor or successors, shall have respectively made suitable provision for the satisfaction of all claims against said Governments respectively, of all persons, wheresoever domiciled, who owe permanent allegiance to the United States of America and who have suffered, through the acts of the Imperial German Government, or its agents, or the Imperial and Royal Austro-Hungarian Government, or its agents, since July 31, 1914, loss, damage, or injury to their persons or property, directly or indirectly, whether through the ownership of shares of stock in German, Austro-Hungarian, American, or other corporations, or in consequence of hostilities or of any operations of war, or otherwise, and also shall have granted to persons owing permanent allegiance to the United States of America most-favored-nation treatment, whether the same be national or otherwise, in all matters affecting residence, business, profession, trade, navigation, commerce and industrial property rights, and until the Imperial German Government and the Imperial and Royal Austro-Hungarian Government, or their successor or successors, shall have respectively confirmed to the United States of America all fines, forfeitures, penalties, and seizures imposed or made by the United States of America during the war, whether in respect to the property of the Imperial German Government or German nationals or the Imperial and Royal Austro-Hungarian Government or Austro-Hungarian nationals, and shall have waived any and all pecuniary claims against the United States of America."

4 "By exertion of the war power, and untrammeled by the due process or just compensation clause, Congress enacted laws directing seizures, use, and disposition of property in this country belonging to subjects of the enemy. Alien enemy owners were divested of every right in respect of money and property seized and held by the Custodian under the Trading with the Enemy Act. United States v. Chemical Foundation, 272 U.S. 1, 9–11, 47 S.Ct. 1, 4, 71 L.Ed. 131; Woodson v. Deutsche, etc., Vormals, 292 U.S. 449, 454, 54 S.Ct. 804, 805, 78 L. Ed. 1357. The title acquired by the United States was absolute and unaffected by definition of duties and limitations upon the power of the Custodian or the Treasurer of the United States. Congress reserved to itself freedom at any time to dispose of the property as deemed expedient and right under circumstances that might arise during and after the war." Quoted from Cummings v. Deutsche Bank, 300 U.S. 115, 120, 57 S.Ct. 359, 362, 81 L.Ed. 545.

5 "Chapter 3. Inheritance Rights of Aliens

"259. The rights of aliens not residing within the United States or its territories to take either real or personal property or the proceeds thereof in this State by succession or testamentary disposition, upon the same terms and conditions as residents and citizens of the United States is dependent in each case upon the existence of a reciprocal right upon the part of citizens of the United States to take real and personal property and the proceeds thereof upon the same terms and conditions as residents and citizens of the respective countries of which such aliens are inhabitants * * * and upon the rights of citizens of the United States to receive by payment to them within the United States or its territories money originating from the estates of persons dying within such foreign countries.

"259.1. The burden shall be upon such nonresident aliens to establish the fact of existence of reciprocal rights set forth in Section 259.

"259.2. If such reciprocal rights are not found to exist and if no heirs other than such aliens are found eligible to take such property, the property shall

can Treaty of 1925, Article IV, supra, was in effect, and similar treaties with all the principal powers were also in effect. This language of treaty concerning reciprocal rights was practically universal with only slight difference of phraseology.

Prior to our active participation in the Second World War, Congress and the President under the emergency provision of the Trading with the Enemy Act, had taken action. On May 7, 1940, 54 Stat. 179, Congress by joint resolution gave the President extensive powers "during time of war or during any other period of national emergency"concerning transfer of property (amending subdivision (b) of Section 5 of the Act of October 6, 1917).

On April 10, 1940, the President had issued Executive Order 8389, 12 U.S.C.A. § 95a note which was ratified and confirmed by a joint resolution of May 7, 1940, Section 2, Joint Resolution, 54 Stat. 179. On June 14, 1941, Executive Order 8389, supra, was modified. Executive Order 8785. Further modifications were made after the United States entered the war December 8, 1941. Executive Order 8963, December 9, 1941; Executive Order 8998 of December 26, 1941; The "First War Powers Act," an amendment of the Trading with the Enemy Act, 55 Stat. 838, 839, §§ 301, 302, 303, was enacted December 18, 1941, 50 U.S.C.A. Appendix, §§ 616–618; Executive Order 9095 of March 11, 1942, 50 U.S.C.A.Appendix, § 6 note, providing for the office of Alien Property Custodian and fixing his powers and duties.

This Executive Order 9095 provided in Section 3 as follows:

"3. Any property, or interest therein, of any foreign country or a national thereof shall vest in the Alien Property Custodian whenever the Alien Property Custodian shall so direct * * *."

On January 23, 1943 the Alien Property Custodian issued his so-called Vesting Order No. 762, purporting to vest in said Alien Property Custodian "all the right, title, interest and claim of the four German nationals in and to the estate of Alvina Wagner, deceased, and all the right, title and interest and estate of those German nationals in and to the decedent's real property in San Francisco."

The vesting order was filed with the Division of the Federal Register on January 27, 1943 and was published January 28, 1943 in 8 Fed.Reg. 1252. On April 6, 1943 the Alien Property Custodian filed his complaint in this action, in which he claimed to be the owner of all the estate of Alvina Wagner, deceased, by virtue of said vesting order, and demanding that the Superior Court in and for the City and County of San Francisco, California, sitting in probate to administer the estate of Alvina Wagner, deceased, distribute said property to him as owner thereof, as and when ready for distribution upon the settlement of the final account. This action, in effect an action to quiet title of the Alien Property Custodian, was within the jurisdiction of the District Court Markham v. Allen, 66 S.Ct. 296, supra. The District Court

---

be disposed of as escheated property.

"Sec. 2. This act is hereby declared to be an urgency measure necessary for the immediate preservation of the public peace, health and safety within the meaning of Section 1 of Article IV of the Constitution of the State of California, and shall take effect immediately. The following is a statement of the facts constituting such necessity:

"A great number of foreign nations are either at war, preparing for war or under the control and domination of conquering nations with the result that money and property left to citizens of California is impounded in such foreign countries or taken by confiscatory taxes for war uses. Likewise money and prop-

erty left to friends and relatives in such foreign countries by persons dying in California is often never received by such nonresident aliens but is seized by these foreign governments and used for war purposes. Because the foreign governments guilty of these practices constitute a direct threat to the Government of the United States, it is immediately necessary that the property and money of citizens dying in this country should remain in this country and not be sent to such foreign countries to be used for the purposes of waging a war that eventually may be directed against the Government of the United States." St.1941, p. 2474.

rendered judgment to that effect and the American heirs of Alvina Wagner appeal.

The appellants contend that the California Probate Code Sections 259, 259.1, and 259.2, quoted in full in footnote 5, supra, limit the right of nonresident aliens to take by will or by succession to those cases where reciprocal rights are extended to the United States citizens by the country of their residence and that such limitation is within the legislative power of the State, and is valid. We will first address ourselves to this question.

Constitutionality of Sections 259, 259.1 and 259.2, Cal. Probate Code, supra.

The appellee claims that the provisions of the Probate Code of California, §§ 259, 259.1 and 259.2, dealing with reciprocal rights of nonresident aliens to land and personal property by inheritance or succession are void and unconstitutional because the California statutes apply in the domain of foreign affairs which is the exclusive prerogative of the Federal Government, and fully occupied by it.

█ The federal power invoked by the appellee is predicated upon the provisions of the Constitution vesting the treaty making power and war power, including the right of capture, in the Federal Government (Constitution, Article I, § 8, Clause 11), and the provisions of the Constitution which prohibit states from entering into treaties with other powers. Constitution, United States, Article I, § 10, Clause 1. It is claimed by the appellee that the power of the Federal Government to deal effectively with the rights of enemy aliens is interfered with and frustrated by the statute of California above cited. However, it is clear that the state has power to regulate the right of inheritance and succession and testamentary disposition of property within the state, Irving Trust Company v. Day, 314 U.S. 556, 562, 62 S.Ct. 398, 86 L. Ed. 452, 137 A.L.R. 1093. The appellants claim that the power of the state government to make the right of non-resident aliens to succeed to property of the deceased depend on a reciprocal right on behalf of American citizens is a clear exercise of the right of the state to determine questions of inheritance, testamentary disposition and succession.

█ Assuming for the time, although this point is disputed, [6, 7] that the Treaty of 1925, Article IV grants the reciprocal rights required by the provision of the California Probate Code under consideration, the requirement of reciprocity by the statute is only of importance if Article IV of the treaty is abrogated or suspended so that there is no longer any treaty provision to meet the condition of the California Probate Code requiring such reciprocity. In that case the California statute, if valid, would deny rights of inheritance to the German nonresident aliens. It is to meet this situation that the appellee claims that the state statute is void because it violates the Constitution of the United States.

The appellee argues that the War Powers granted to the United States by the Constitution include by express provision (U.S. Constitution, Article I, Clause 10) the right to capture enemy property and that a state law which prevents or interferes with such capture is an interference with the power and is consequently void. The difficulty with this contention in the case at bar is the claim that the enemy alien has no right to the property. If the California statute is valid, it is not enemy property. The argument that the state should treat alien enemies more generously in order that the United States might seize their property and use it for its own purposes seems hardly valid as applied to constitutional power. The California statute does not apply to enemies only, but applies as well to any nonresident aliens, friends and allies as well as foes. Recent decision of the Supreme Court, Korematsu v. United States, 323 U.S. 214, 217, 65 S.Ct. 193, 89 L.Ed. 194; Kiyoshi Hirabayashi v. United States, 320 U.S. 81, 89, 63 S.Ct.

---

[6, 7] The California statute requires that the proceeds derived from the sale of land provided for in Article IV of the Treaty and the personal property shall be received in the United States (see California Probate Code, § 1026, also §§ 1060–1066).

There is also a question raised as to whether the nonresident alien can take personal property located within the United States.

1375, 87 L.Ed. 1774, concerning the war powers of the Federal Government show that the war power affects almost every field of private right on the basis of necessity. If this great reservoir of Federal power is ipso facto a denial of any power to the States in that reservoir, whether or not a war is being waged or such powers are being exercised, then the power of states is thrown into the utmost uncertainty and confusion.

▆ It should be said in addition that the appellee relies upon a so-called emergency clause of the California Probate Code (California Statutes 1941, Chapter 895, quoted in footnote 5) to show that the purpose of the California legislature was to prevent the export of money to foreign powers, which were seizing and diverting if not appropriating the property of citizens of California. It is said that this makes the California statute one of retribution and confiscation and thus within the domain of federal power over foreign affairs. The statute does not purport to be retributive and the addition of the emergency clause does not make it so. This emergency clause is required by the state constitution where a law is to take effect immediately rather than in 90 days, as would otherwise be the case. The motive of the legislature is not subject to judicial scrutiny, so long as the legislature acts within its constitutional authority. Amy v. Watertown, 130 U.S. 301, 319, 9 S.Ct. 530, 32 L.Ed. 946. We conclude that the California statute is constitutional and valid.

Assuming as we have decided, that the statute of California in making the right of the nonresident German legatees and devisees depend upon a reciprocal right, we have need to consider whether or not the Treaty of 1925 with Germany providing for reciprocity meets the requirements of the California statute. Before considering the exact language of the treaty, the effect of which is a subject of disagreement between the parties, we will consider the claim of the appellants that the treaty (Art. IV supra) in question was either abrogated or suspended during World War II.

### War Abrogating Treaty.

▆▆ The question whether the outbreak of war abrogates wholly a treaty of peace, designed avowedly for a state of peace, is passed over as unnecessary and improper for discussion. Eminent authorities on international law agree that the stipulations of a treaty of peace are not all necessarily avoided or made inoperative by war. Those stipulations which are incompatible with existence of war, and those which war makes it impossible to carry into execution are avoided or become inoperative; others of such intrinsic nature as to be applicable and feasible in war may continue.[8] Accordingly, under those authorities it is sufficient to determine whether Article IV of that Treaty became inoperative on and after December 8, 1941, and thereby struck away the possibility that reciprocal rights of inheritance and testamentary succession existed between Germany and the United States and their resident nationals. The trial court in its opinion alludes to this question but does not decide it nor base judgment upon any conclusion as to it, nevertheless it is implicit in any decision of the case.

▆ By express terms of Article IV of the Treaty "Nationals of either High

---

[8] V. Hackworth, International Law Digest § 505, citing Karnuth v. United States, on Petition of Albro, 279 U.S. 231, 236, 49 S.Ct. 274, 73 L.Ed. 677; 5 Moore, International Law Digest, § 779, p. 383, quoting 1 Columbia Law Review, No. 4, pp. 209–223; 2 Oppenheim, International Law, § 99; Hall, International Law, 8th Ed., pp. 405, 453, 454, 457; and see Techt v. Hughes, 229 N.Y. 222, 128 N.E. 185, 11 A.L.R. 166 with Note page 180.

See also the following cases on the effect of war to render treaty stipulations inoperative: The Rapid, 20 Fed. Cas. pages 297, 300, No. 11,576, 1 Gall. 295, affirmed 8 Cranch 155, 3 L.Ed. 520; Jecker, Torre & Co. v. Montgomery, 18 How. 110, 112, 59 U.S. 110, 112, 15 L.Ed. 311; United States v. Grossmayer, 9 Wall. 72, 75, 76 U.S. 72, 75, 19 L.Ed. 627; Ross v. Jones, 22 Wall. 576, 586, 89 U.S. 576, 586, 22 L.Ed. 730; Mayer v. Garvan, 1 Cir., 278 F. 27, 32; Second Russian Ins. Co. v. Miller, 2 Cir., 297 F. 404, 410, affirmed 268 U.S. 552, 45 S. Ct. 593, 69 L.Ed. 1088.

Contracting Party may have full power to dispose of their personal property of every kind within the territories of the other." With respect to "real or other immovable property" or "interests within" one country devolving by the death of a national of the other, a national of one "were he not disqualified by the laws of the country where such property or interests therein is or are situated," "shall be allowed a term of three years in which to sell the same * * * without restraint or interference" and except from any duties or charges other than those which may be imposed on nationals of the country where the property "from which such proceeds may be drawn." Contrasted with this, from and after December 8, 1941 (before Alvina Wagner made her will) it has been unlawful for a German national to enter the United States, to have any communication of a business nature therewith, to remove property or money therefrom, and reciprocally unlawful for a national of the United States to have dealings or communications with one of Germany. No money or property could be taken out of this country to Germany or for its nationals. See Trading With the Enemy Act §§ 7(c, d) and 5, as amended by 55 Stat. 839. In fact, even, before there was war (December 8, 1941), Executive Order No. 8389 forbade monetary transmissals such as would have been necessary in case of a national of Germany selling real property pursuant to Article IV of the Treaty of 1925 and seeking to withdraw the money from the United States. [Many other countries than Germany were included in this order, which was made when the United States was not a belligerent.] But the Trading With the Enemy Act was broader and more severe, making it unlawful for the German legatees to be brought into the United States or to transmit communications to them (Trading With the Enemy Act § 3),

or to have any form of business or commercial communications or intercourse with them (Trading With the Enemy Act §§ 2 and 3). They therefore could not come into the United States and as residents become eligible for naturalization or by treaty qualify (see California Alien Land Law §§ 1 and 2, Stat. 1921, p. lxxxiii, as amended 1923, p. 1021, 1927, p. 880) to take land; they are incapable of taking by will because they are incapable of taking property by law (see California Probate Code, § 27); and they are incapable of "appearing and demanding" the property if it were distributed to them, either as legatees or as heirs, in consequence of which it must be distributed to the State of California for escheat, if there are no other qualified heirs (California Probate Code, §§ 1026, 1027).[9]

These conditions are irreconcilable with Article IV of the Treaty of 1925, which under the rules above stated must therefore be regarded as inoperative since December 8, 1941.

■ However, basically the question of whether or not Article IV of the treaty remains in effect during the war depends upon the intent of the high contracting parties as expressed in the treaty, or as implied therefrom by the customary interpretation of such agreements by nations generally. It is important therefore to consider the relation of the United States and Germany at the time the Treaty of 1925 was negotiated, and when ratified and confirmed in 1925, as indicating their intent. (As to previous treaties see discussion in footnote 8, supra.) This treaty was the result of the first World War, which had terminated so far as other powers were concerned by the Treaty of Versailles which the United States refused to join in. Congress in 1921 had passed a joint resolution approved July 2, 1921, 40 Stat. 106, supra, in effect appropriating or

---

[9] Calif.Prob.Code, § 1026 reads: "A nonresident alien who becomes entitled to property by succession must appear and demand the property within five years from the time of succession; otherwise, his rights are barred and the property shall be disposed of as escheated property."

Calif.Prob.Code, § 1027 in part reads: "If the court, at the time set for the hearing of the final account, or such time thereafter to which the matter may be continued, does not distribute the entire balance of the estate remaining for distribution to known heirs, devisees or legatees entitled to succeed thereto, it must distribute to the State of California that portion of such estate not distributed to such known heirs, devisees or legatees."

confiscating all property of Germany or German nationals "which was, on April 6, 1917, in or has since that date come into the possession or under control of, or has been subject of a demand by the United States of America or of any of its officers, agents, or employees, from any source or by any agency whatsoever \* \* \*", (See footnote No. 3.)

It provided that such property "shall be retained by the United States of America and no disposition thereof made, except as shall have been heretofore or specifically hereafter shall be provided by law until such time as the Imperial German Government \* \* \* or their successor or successors, shall have respectively made suitable provision for the satisfaction of all claims against said Governments respectively, of all persons, wheresoever domiciled, who owe permanent allegiance to the United States of America and who have suffered [loss] through the acts of the Imperial German Government \* \* \*". Germany in the Treaty of Berlin of 1921 agreed with the United States to this treatment of Germany and German nationals and expressly ratified the same. The Supreme Court later (1936) in Cummings v. Deutsche Bank, 300 U.S. 115, 57 S.Ct. 359, 81 L.Ed. 545, supra, held the effect of this resolution and treaty of 1921 was to vest absolute title to such property in the United States. The Prussian treaty in effect at the time the United States declared war against Germany in World War I (April 6, 1917) concerning reciprocal rights of inheritance of citizens, Treaty with Prussia of May 1, 1828, Article XIV, 8 Stat. 378, 384, was substantially the same as in the treaty with Germany or its successor negotiated in 1923, effective in 1925. As to the German Treaty in effect at the time the United States declared war against Germany in 1917, we have seizure of property authorized by the Trading With the Enemy Act, and its confiscation by the United States, and agreement thereto by Germany. Moreover, although not of controlling importance, we have a new treaty negotiated and entered into containing in Article IV, supra, the reciprocal rights provision which would have been unnecessary if such provisions were still in effect under the older treaty. The conduct of the two nations entering into the treaty of 1925 immediately prior thereto is not consistent with the idea that the high contracting parties believed that the similar provision of the earlier treaty survived the impact of war, or that Article IV of the later treaty would survive another World War. There is not a single word that indicates that the parties believed that property inherited under the laws of the nation, was any more sacred, or any less likely to confiscation than any other alien owned property within the jurisdiction of the United States. In the teeth of this situation general statements of textwriters, or of courts or judges, based upon the modern tendency to give greater consideration to private rights during war cannot have much weight. It was agreed in the Treaty of 1921 that with reference to treaty rights under War I treaties, such private rights should give way to the needs or to the results of war.

In addition to the conclusions based upon the effect of World War I, upon the Prussian Treaty of 1828, we have the authorization in War Powers Act of 1941, an amendment to the Trading With the Enemy Act, 55 Stat. 838, 839, to the President, "With respect to any property, subject to the jurisdiction of the United States; and any property or interest of any foreign country or nationals thereof shall vest, when, as, and upon the terms, directed by the President, in such agency or person as may be designated from time to time by the President, and upon such terms \* \* \* as the President may prescribe such \* \* \* property shall be \* \* \* dealt with \* \* \* for the benefit of the United States." Section 301, subsection (B). The Act contains no hint or suggestion that property to be inherited after December 8, 1941 should not be subjected to confiscation although that which had been theretofore inherited, would be so subject. Thus Congress by ignoring the Treaty effectively provided for breaking or suspending or abrogating the reciprocal inheritance provision of the Treaty. To award the decedent's property to the Alien Property Custodian would be to give him a right in direct contradiction to the

right of aliens under the Treaty which he contends is in full effect.

### Amendment to California Law—Burden of Proof.

The California statute under consideration (Sections 259, 259.1 and 259.2) provided in § 259.1 that the burden of proving the existence of reciprocal rights dealt with in Section 259 was upon the "nonresident alien." This section was amended in 1945 (Chapter 1160, California Laws, § 259, 1945) to provide that "It shall be presumed that such reciprocal rights exist and this presumption shall be conclusive unless prior to the hearing on any petition for distribution of all or a portion of such property to an alien heir, devisee or legatee not residing in the United States or its territories a petition is filed by any person interested in the estate requesting the court to find that either one or both of such reciprocal rights does not or do not exist as to the country of which such alien heir, devisee or legatee is resident. Upon the hearing of such petition the burden of establishing the nonexistence of such reciprocal right or rights shall be upon the petitioner. * * *"

The amendment was enacted after the decision of this court upon the appeal but before the decision of the Supreme Court on January 7, 1946. It is claimed by the appellee in the brief filed herein after the case was remanded to this court, that the amendment is applicable to the present appeal and requires affirmance.

The appellee's claim seems to be that the new law (California Probate Code, § 259, California Statutes 1945) holds the title in suspense until the nonresident alien acts and that during this interval the property tentatively rests in the German devisees and legatees and consequently is subject to seizure as their property before the procedure outlined by the California statute, to ascertain the rights of heirs, legatees and devisees.

It may take much time to determine who the heirs are, witness the Blythe case cited in the briefs (In re Estate of Blythe, 110 Cal. 226, 42 P. 641; Blythe v. Hinckley, 180 U.S. 333, 21 S.Ct. 390, 45 L.Ed. 557), wherein the matter was in litigation for over 15 years. Nevertheless, when the will is proved, or the heirs ascertained, their title relates back to the death of the owner—there is no hiatus. Western Pacific Railroad Co. v. Godfrey, 166 Cal. 346, 349, 136 P. 284, Ann.Cas.1915B, 825, and cases cited.

The Federal Court takes judicial notice of all treaties, and so does the state court. They do not have to be proved, consequently if the treaty grants reciprocal rights, there is no need of further proof. Whether it has been repealed or abrogated is also a subject of judicial notice.

It is conceivable that the foreign nation might without a treaty, and by its own statute grant rights which were in fact fully reciprocal, if this were done by statute, it would have to be proved, and what must be proved to sustain a complaint must be alleged. There is no such allegation here.

Reversed and remanded.