## Case No. 10,755a.

### The PARKHILL.[1]

District Court, E. D. Pennsylvania.   July 23, 1861.

CIVIL WAR—SUSPENSION OF COURTS OF JUSTICE— PRIZE—RESTITUTION.

1. When, through civil war against an established government, its courts of justice are closed in certain districts in which its laws cannot be enforced peaceably, hostilities for the restoration of its authority may be prosecuted in such modes as are lawful in foreign wars against public enemies.

2. When, in the prosecution of such hostilities, a naval capture has been made of a merchant vessel, which is afterwards libeled as prize, no resident within such hostile district can sustain a proprietary claim of restitution.

[Cited in The Amy Warwick, Case No. 341; The Hiawatha, Id. 6,451.]

In admiralty.

CADWALADER, District Judge. In December last, a convention of delegates, whose election had been provided for by the legislature of South Carolina, proclaimed her independence of the constitutional government of the United States. This revolutionary attempt has been followed by similar acts of such conventions in 10 other states. The 11 states are contiguous. A revolutionary constitutional confederation has been organized in them, under the usurped authority of these conventions, with a co-operation or acquiescence of those administering the former state governments. Incidental hostilities against the United States, including the capture of some of their forts, have been followed by organized opposing hostilities, and counterhostilities on so large a scale that the present proportions of the contest resemble those of a general war. In the prosecution of the naval hostilities on the part of the United States, one of their frigates, on the 12th of May last, off Charleston, S. C., captured this vessel, then on a voyage from Liverpool to Charleston. She was brought for adjudication into this district, where a libel praying her condemnation as a prize has been filed on behalf of the United States. The material averments of the libel, which is more special in its form than has been usual in prize cases, are that she attempted

to violate the blockade of Charleston, and that she is the property of insurgents, traitors, and public enemies. If she is confiscable on the latter ground, the question of blockade will not arise. A claim, with a prayer of restitution, has been exhibited on behalf of her alleged proprietors, who are described in the claim as of the city of Charleston, in the state of South Carolina, and citizens of the United States. They are thus, by their own showing, commercial residents of South Carolina. The question which thus arises, independently of that of the blockade, is whether, in the present hostile relation of South Carolina, a resident of that state can sustain a proprietary claim of restitution in a prize court of the United States.

The points upon which this question depends are to be ascertained, not from reasons which may have been assigned or opinions entertained, by the naval captors, nor from orders which they may have received from the president or from the navy department, nor from the president's proclamations, but from the allegations and proofs in the cause according to the rules of proceeding of the court. One of the purposes of naval warfare is to diminish the power of hostile governments or of other hostile organizations by the indiscriminate maritime capture of the private property of all persons residing in places within hostile dominion or in permanent or temporary hostile occupation. The capture and confiscation of such property, by destroying, or suppressing the maritime trade of such places, diminishes their wealth, and thus reduces the power of their hostile rulers. The liberation of the property when captured, whether the individual residents who owned it are personally well or ill affected in feeling towards the government of the captors, would restore its value in wealth to the hostile place. In prize courts, therefore, the property of every such resident, when captured at sea, has usually been regarded as confiscable. 3 C. Rob. Adm. 18. 26–28, and Append. B, p. 8. The rule applies, though he may owe a duty of allegiance to the captor's government, and may, while in the hostile place have been perfectly loyal in his own feeling and conduct. After the declaration of war against England in 1812, a citizen of the United States residing in England, before any knowledge of the war, shipped merchandise for the United States which, having been captured on the voyage, was condemned as prize. The supreme court said: "Although he cannot be considered as enemy, in the strict sense of the word, yet he is deemed such with reference to the seizure of so much of his property, concerned in the trade of the enemy, as is connected with his residence. It is found adhering to the enemy, although not criminally so unless he engages in acts of hostility." The Venus, 8 Cranch [12 U. S.] 280. If, on receiving information of the war, he had returned to the United

States, leaving in England merchandise bought by him before the war, and it had afterwards been shipped for transmission to him, it would, if captured on the voyage, have been confiscable as English property. This appears from the Case of Escott, 1 Bos. & P. 349, 350, in the note; 1 C. Rob. Adm. 203; 8 Durn. & E. [8 Term R.] 557; 16 Johns. 459, 460; The Lady Jane, 1 C. Rob. Adm. 202; 8 Durn. & E. [8 Term R.] 557. Those predatory maritime hostilities which the law of war sanctions could not be prosecuted with effect if this rule were not applied with inexorable rigor.

It has been thus applied, with regret, in cases of the temporary hostile occupation of places by an invading force and in other cases of hardship, where the intentions of the parties were such as might have entitled them to indulgence. During the war of our Independence, in the course of the hostilities between France and England, some of the British West India possessions, including Grenada, were captured by the French, and held by them under temporary subjection. The hope constantly entertained by the British public and by the islanders, who were "still British in principle and affection, and many of them by actual residence," was that these islands would soon revert to the British dominion. The previous British monopoly of their trade, under the restrictive colonial system, had made them dependent upon Great Britain for supplies of absolute necessity. The French partiality for their own islands induced them to withhold such supplies. In this necessitous condition of the sufferers, the question stated in an English prize court was "whether it was so unlawful for a British subject to send supplies to the British plantations in the Grenada Islands, whilst under the misfortune of a temporary subjection to the French, as that a confiscation of the supplies so sent should be the just and legal consequence of his misconduct." An intended supply of provisions owned in and shipped from Ireland, having been captured on the voyage, this question was answered in the affirmative. The British privy council affirmed, on appeal, a sentence confiscating the cargo as constructively French property, notwithstanding its actual Irish ownership. The Bella Guidita, 1 C. Rob. Adm. 207–209; Id. 210, note; 8 Durn. & E. [8 Term R.] 559; 16 Johns. 460. See [U. S. v. Rice] 4 Wheat. [17 U. S.] 254; U. S. v. Hayward [Case No. 15,336]; Fleming v. Page, 9 How. [50 U. S.] 615; 1 Dod. 451. The result would, of course, have been the same if the cargo had, when shipped, been owned by the parties in Grenada whose wants were to have been supplied, and this though they had, in affection, been the most loyal subjects of the British crown. The Hoop, 1 C. Rob. Adm. 98; The Lady Jane, Id. 202. If during an organized hostile contest like the present, against an established government, rules of decision different from those which have been stated prevailed in the prize courts of such a government, it could not effectively prosecute maritime hostilities to suppress rebellion or insurrection. The question is, whether any different rules of public law determine the question of confiscability during such a contest.

In this contest, the purpose of the revolted Confederates is to establish their independence of the constitutional Union, and the purpose of the United States to maintain this Union inviolate. The states which compose the constitutional Union are not, with reference to it, either foreign or independent states. The several states are, it is true, independent of one another. They are also independent of the government of the United States, except for such purposes as the constitution specifies. But, for all the specific purposes for which it was adopted, the states are, with reference to the United States, dependent and subordinate, and not foreign, states. In the constitution, the word "foreign," occurring in five clauses of the original instrument, and once in the amendments, is always used in such a sense as to exclude its applicability to a state of the Union, or to anything appertaining to one. The states, therefore, though for some purposes foreign to one another, are for all national purposes embraced in the constitution united under a government which is both independent and supreme [Fletcher v. Peck] 6 Cranch [10 U. S.] 136; [Cohens v. Virginia] 6 Wheat. [19 U. S.] 381; [English v. Foxall] 2 Pet. [27 U. S.] 590; [State of Rhode Island v. State of Massachusetts] 12 Pet. [37 U. S.] 720; [Ableman v. Booth] 21 How. [62 U. S.] 517.

The contest is thus an internal war, as distinguished from one of those hostile contests between established and mutually recognized governments which are called foreign wars. The several acts which, in the respective conventions of the revolted states, instituted the revolutionary movement, have been called "ordinances of secession." The states in which these ordinances of attempted secession were promulgated have also been called "seceded states." These phrases might mislead if the revolutionary character of the movement called "secession" were excluded from its definition. The phrase "a seceded state" might then imply that the attempted secession had been consummated, either in fact or in law. A careless use of the phrase "right of revolution" has often confounded its meaning and that of the phrase "power of revolution." A revolution must have been consummated as an act of power before the question of its rightfulness can be judicially considered. Therefore, the result alone of this intestine war is to determine whether the power exists. Its existence or nonexistence appears to be the sole question in the contest. Even governments which are not parties in such a contest cannot, without violating rules of public law, recognize the existence of a right of revolution in any case

in which its assertion has not already been sustained by a sufficient power to vindicate and establish it effectively. [Luther v. Borden] 7 How. [48 U. S.] 1. If the authority of an established government has been suspended in a part of its territory by insurgents, who have temporarily substituted a revolutionary government in it, other governments which are not parties to the contest cannot, without a breach of international decorum, declare precipitately that the case is that of civil war, as distinguished from rebellion or unorganized war. But if civil war, in truth, is its legal character, such other governments may lawfully treat the revolted insurgents, not as mere pirates or outlaws, but as entitled in the war to the same immunities as ordinary belligerents in a foreign war. This was done by the government of the United States in the case of the revolted Spanish American colonists, when the proper time for deciding upon it arrived. But, in cases of revolutionary civil war, governments not parties to the contest cannot, without violating the rules of public law, institute conventional or diplomatic or other friendly relations with revolutionary governments until their permanence has been established, either through their complete belligerent success, or through the old government's acquiescence or continued inaction or hopeless belligerent feebleness. Under this head of diplomacy, many complicated questions between the representatives of superseded powers and foreign governments have arisen. But such disputable questions do not arise in judicial tribunals of the former governments. Neither the power nor the right of revolt against a government can be asserted in its own courts. In England, the didactic essays and forensic arguments in support of the revolution of 1688 have been based upon its consummation as well as upon its asserted justice. The judicial opinions in support of it were, as its date, founded entirely upon its consummation. The technical reasoning on which they rested was, at first if not at last, quite as refined as it was practical. A criterion of the consummation of a revolution effected by the forcible deposition of an English king had been that the courts of law within the realm were no longer held in his name. The death of a king had, under the statute (1 Edw. VI. c. 7), discontinued all pending proceedings in these courts (7 Coke, 29, 30). His deposition by force had, when consummated, the same consequence in this respect as his death. Y. B. 10 Edw. IV. fol. 13a; 49 Hen. VI. pl. 1; 1 Bl. Comm. 249. Records in the Fœdera show that a reigning king, when he crossed the sea, had usually deputed a viceroy to administer the government of England until his return; and a record in Rastall, 544b, pl. 8 (see Skin. 271) shows that when this was omitted the king's absence from the realm had, in the discontinuance of process, the same effect as his death. When James II., in December, 1688, crossed the sea without making any delegation of an authority to administer the government in his absence, the argument of the supporters of the revolution was that, as the courts of justice could not be lawfully held, he had abdicated the government, and that the throne was therefore vacant when the new king and queen afterwards accepted the crown. A former crown lawyer was afterwards removed by the new government from his office for questioning the soundness of this argument, and refusing to carry it out in one of its practical consequences. 12 State Tr. 1269, 1270. It received the sanction of judicial opinions, and was confirmed by declaratory legislation. Skin. 271; 3 Mod. 252, 253; St. 1 W. & M. c. 4; St. 2 W. & M. c. 1; 3 Lev. 283; 2 Vent. 185, 193, 197. In the next century, our declaration of independence and the belligerent success of its revolutionary movement established the transformation of British colonies into sovereign states. Our own judicial tribunals, of course, dated this change of government from the time at which it was proclaimed. But British tribunals do not recognize it as having occurred until the subsequent pacification.

In 1794, in an English court, composed of most eminent judges appointed by a special commission, a leading counsel having observed "that a people had a right to alter their government," the court said: "That proposition, under certain circumstances, may be true; but it ought not to have been introduced into a court of justice bound to administer the law of the existing government and to suffer no innovation upon it." 24 State Tr. 1371. The supreme court of the United States have often said, in effect, that the consideration of political questions belongs in the first instance to other departments of the government than the judicial. When such questions are not involved immediately in the treaty-making power, and are not affected by any provision of the constitution, or legislation of the government, they may, so far as its foreign relations are concerned, be determinable, to some extent, conformably with established rules of public law, by the president, through diplomatic intercourse or otherwise. But no question as to any political relation of the government of the constitutional Union to one of the states, can be determined by the president in any mode or for any purpose whatever. None of the departments or organs of the government can ever lawfully recognize the existence of a right in one of the states to secede from this Union independently or distinguishably from a power to consummate such a revolution by hostile force; and no question as to the existence of such a power, as distinguished from right, can be entertained in the judicial or in any executive department of the government. To which of its departments the consideration of such a question, if it should ever arise, might belong, is not the present inquiry. That secession, so called, is neither more nor less than

attempted, as distinguished from consummated, revolution has been sufficiently shown.

The foregoing remarks do not suffice to define the legal character of the contest in question. It is a civil war, as distinguished from such unorganized intestine war as occurs in the case of a mere insurrectionary rebellion. Civil war may occur where a nation without an established government is divided into opposing hostile factions, each contending for the acquisition of an exclusive administration of her government. If a simple case of this kind should occur at this day, the governments of nations not parties to the contest might regard it as peculiarly one of civil war. As between the contending factions themselves, however, neither could easily regard their hostile opponents in the contest otherwise than as mere insurgents engaged in an unorganized rebellion. Thus, in the language of Sir M. Hale, "every success of either party would subject all hostile opponents of the conqueror to the penalties of treason." A desire to prevent the frequency of such a result was the origin of the rule of law, that allegiance is due to any peaceably established government, though it may have originated in usurpation. The statute of 11 Hen. VII. c. 1 (A. D. 1494), excusing an English subject who has yielded obedience, or has even rendered military service, to a ruler who was king in fact, though not in law, was declaratory of a previous principle of judicial decision. Br. Treason, pl. 10, cites 9 Edw. IV. 12 (should be 9 Edw. IV. fol. 1, b, pl. 2); 1 Hawk. P. C. bk. 1, c. 17, §§ 10–16; Fost. Crown Law, 188, 396–403; 3 Inst. 7. It has already been stated that a king, in whose name justice was administered in the courts of law, was usually regarded as in actual possession of the government. Civil war of another kind occurs where an organized hostile faction is contending against an established government whose laws are still administered in all parts of its territory, except places in the actual military or naval occupation of insurgents or their adherents. In such a case, the question has been whether a place in the actual military occupation of the revolutionary faction, or of its adherents, may, under the law of war, be treated by that government as if the contest was a foreign war, and the place occupied by public enemies. In the case of a maritime blockade of such a place, the affirmative of this question was decided in England in the year 1836. It had previously been so decided by the supreme tribunal of marine at Lisbon. 3 Scott, 201; 2 Bing. N. C. 781.

In the opinion of Grotius, Demosthenes had, in the case of The Thracian Chersonese, corectly stated the rule of public law to be that, wherever judicial remedies are not enforceable by a government against its opponents, the proper mode of restoring its authority is war. Gro. De Jure B. § 23. The opinion of Grotius has given to this case, in which the views of Demosthenes prevailed at Athens, the force of a modern precedent. The Chersonese was a dependency of Athens when other parts of Thrace were under the dominion of Macedonia. The city of Cardia, in the Chersonese, resisted the Athenian authority. Deiopeithes, the Athenian commander in the Chersonese, was prevented from reducing the Cardians to submission through the interference of Philip of Macedon, then professedly at peace with Athens, who sent a military force to their assistance. Deiopeithes, considering this measure an act of hostility on the part of Philip, at once, without waiting for instructions from Athens, invaded and ravaged parts of Macedonian Thrace. Philip complained to the Athenians of this conduct of Deiopeithes. Demosthenes, in sustaining it, avoided assuming a defensive position as to the previously intended subjugation, by Deiopeithes, of the Cardians, but incidentally justified it upon reasons which would have sanctioned the prosecution of hostilities against them on the same footing as if the war had been, as to them, a foreign one. Dismissing from consideration the charges against persons whom the judicial administration of the laws could reach, and who might at any time be judicially prosecuted, he contrasted their case with that of those whom the laws could not thus reach, saying that attempts to enforce like remedies against them would only disorder and confuse the administration of the public affairs. "Against those whom the laws cannot reach," said he, "we must proceed as we oppose our public enemies, by levying armies, equipping and setting afloat navies, and raising contributions for the prosecution of hostilities." So an English statesman, in a parliamentary debate upon a judicial question, said, in the year 1696: "You must provide for the government, and when you cannot do it by course of law, then armies must do it when the courts are shut." Speech of Harley, in Fenwick's Case, 13 State Tr. 706.

This doctrine is of obvious applicability to civil war of a third kind, which occurs where the exercise of an established government's jurisdiction has been revolutionarily suspended in one or more territorial districts, whose willing or unwilling submission to the revolutionary rule prevents the execution of the suspended government's laws in them, except at points occupied by its military or naval forces. The present contest exemplifies a civil war of this kind. It was, also, with specific differences, exemplified in the respective contest which resulted in the independence of the United Netherlands and of the United States.

The particular consideration of the legal character of the contest in question may be prefaced by a reference to a case in the supreme court of the United States, where, a collision having occurred between the judicial powers of the Union and of one of the

states, Judge Johnson, who concurred in the court's judgment, said: "The general government must cease to exist whenever it loses the power of protecting itself in the exercise of its constitutional powers. Force, which acts upon the physical powers of man, and judicial process, which addresses itself to his moral principles or his fears, are the only means to which governments can resort in the exercise of their authority. The former is happily unknown to our constitution, except as far as it shall be sanctioned by the latter. But, let the latter be obstructed in its progress by an opposition which it cannot overcome or put by, and the resort must be to the former, or government is no more." [Martin v. Hunter] 1 Wheat. [14 U. S.] 363. Within the limits of two of the states in which so-called ordinances of secession have been proclaimed, the execution of the laws of the United States has not been wholly suppressed. They are enforceable in the Western judicial district of Virginia, and perhaps in the adjacent Eastern district of Tennessee. In the other nine states which profess to have seceded, including South Carolina, those laws are not at present enforceable any where.

The constitution of the United States prohibits the enactment by congress of a bill of attainder, and secures in all criminal prosecutions to the accused the right to a speedy public trial by jury of the state and district wherein the crime shall have been committed, which district must have been previously ascertained by law. Therefore, if a treasonable or other breach of allegiance is committed within the limits of one of these nine states, it is not at present punishable in any court of the United States. This was practically shown in a recent case. U. S. v. Greiner [Case No. 15,262]. War is, consequently the only means of self-redress to which the United States can, in such a case, resort for the restoration of the constitutional authority of their government. The rule of the common law is that, when the regular course of justice is interrupted by revolt, rebellion, or insurrection, so that the courts of justice cannot be kept open, civil war exists, and the hostilities may be prosecuted on the same footing as if those opposing the government were foreign enemies invading the land. The converse is also regularly true; so that, when the courts of a government are open, it is ordinarily a time of peace. But though the courts be open, if they are so obstructed and overawed that the laws cannot be peaceably enforced, there might, perhaps, be cases in which this converse application of the rule would not be admitted. 1 Knapp, 346, 360, 361; 1 Hale, P. C. 347; Co. Litt. 249b.

The present case is one in which the courts are in the strongest sense closed. That such a war as the present should be restricted in the modes of its prosecution within limits more narrow than foreign wars, would frustrate its purpose, and place the former es-

tablished government on an unequal footing with its hostile opponents. The doubt heretofore suggested has been whether the former government has not, in such a contest, greater belligerent privileges than in a foreign war. By a treaty between England and the States General, their merchant vessels might, when England was at war, carry her enemies' goods without their being liable to capture. In the war of American Independence, it was decided in an English prize court that this treaty did not exempt the ships and goods of rebellious Americans, carried in Dutch merchant vessels, from confiscability. The Aletta, cited 1 Hay & M. 13.[2]

---

[2] During the civil war between the French republic and the revolted negroes of St. Domingo, the French having been driven out of possession of the principal part of the island, their government prohibited all maritime communication with places on its coast occupied by the rebels, under the penalty of confiscation of vessels and cargoes, and afterwards imposed the like penalty in all cases in which vessels going to or from such places might be captured at anchor, or under sail at a distance of less than two leagues from the coast. Merchant vessels of the United States trading with such places, having been captured at sea at distances, in some cases, of less, and, in others, of more, than two leagues from the coast, were alike condemned in French prize courts. The judges of the supreme court of the United States, agreed in opinion that the French government's ancient sovereignty over the colony, must be considered as still subsisting. That France might exercise belligerent rights in the contest, in addition to those of her sovereignty, was asserted by Chief Justice Marshall, and denied by no other judge. A majority of the judges ultimately differed from him in opinion upon the question whether, if the above-mentioned acts of the French government were to be considered, not as belligerent, but as mere municipal, regulations, the proprietorship of the former owners of the vessels and cargoes had been divested by the judgments of confiscation. where the captures had been made more than two leagues from the coast. The majority of the court was ultimately of opinion that, whatever might have been in this respect the legal character of the regulations, the proprietorship had been changed by the judgments in these cases, as well as in those in which the captures had been within the two leagues. [Rose v. Himely] 4 Cranch [8 U. S.] 513; [Rose v. Himely], Id. 272; [Hudson v. Guestier] Id. 293; [Hudson v. Guestier] 6 Cranch [10 U. S.] 281, 285. The supreme court of Pennsylvania was afterwards of opinion that the property had been changed in both cases. Chief Justice Tilghman considered the acts of the French republic as not simple municipal regulations, but municipal regulations "connected with a state of war with revolted subjects," in enforcing which "the republic might avail itself of all rights which are given by the law of nations to a government thus circumstanced." He said: "The government of the United States has taken no part between the contending parties. It has never acknowledged the independence of the revolters. We are not at liberty, therefore, to consider the island in any other light than as part of the dominions of the French republic. But, supposing it to be so, the republic is possessed of belligerent rights, which may be exercised against neutral nations who carry on commerce with the revolters. This is not denied; but it is said that the words of the arrêté prove that there was no intention to exercise such rights. This argument is not conclusive. Although the French government, from motives of policy,

A recurrence to the origin of the jurisdiction exercised in prize cases will facilitate the application of some other authorities which it will be necessary to consider. All suits arising from hostile maritime captures are called prize cases. In every such case, the captor's own government should punish his acts when illegal, and vindicate them when lawful. His government may become answerable for their illegality to the governments of injured persons. Diplomatic negotiations and serious international controversies may result, as often has occurred. For these reasons, the causes, modes, and lawfulness of such captures, and all subsequent and incidental questions are investigated in peculiar tribunals of the captor's government, called under some governments marine courts, but in most countries prize courts. Their jurisdiction, except as liable to revision or appeal, is exclusive of that of all other courts of their own respective governments, and is altogether exclusive of that of tribunals of other governments. 2 Doug. 594; 2 Brown, Parl. Cas. 423; [Williams v. Armroyd] 7 Cranch [11 U. S.] 432; [The Adventure] 8 Cranch [12 U. S.] 226; [Crondson v. Leonard] 4 Cranch [8 U. S.] 434; [The Mary] 9 Cranch [13 U. S.] 142, 145. The cognizance of prize cases in the courts of the United States is not, as in the English courts of admiralty, a delegated or dependent authority, but is an inherent part of their general admiralty jurisdiction. Their prize law is, however, administered conformably to the practice established in England. The doctrines on both sides of the Atlantic are likewise the same, except in cases in which English prize courts have, in the opinion of our courts, mistaken or misapplied the rules of public law. In former wars, few such cases have occurred. Though prize courts are courts of the law of nations, this law is not always understood alike under all governments. But, as the supreme court have said, the United States having at one time formed a component part of the British empire, English prize law was our prize law, and when we separated continued to be our prize law, so far as it was adapted to our circumstances and was not varied by our legislation. [Thirty Hogsheads of Sugar v. Boyle] 9 Cranch [13 U. S.] 198; [The Venus] 8 Cranch [12 U. S.] 284.

might not choose to make mention of war, yet it does not follow that it might not avail itself of all rights to which, by the law of nations, it was entitled under the existing circumstances, under the form of a law made for the regulation of the trade and commerce of one of its colonies. This was the course pursued by Great Britain in the Revolutionary War with the United States; and it has not been supposed that she violated the law of nations when she captured and confiscated the vessels of neutrals who carried on trade with the United States, in whatever part of the ocean they were found by her ships of war and cruisers." 3 Bin. 252, 253. The act of the British government to which reference was here made, will be mentioned hereafter in the text.

Under the English, as under other European governments, the king's council, in his name, anciently heard, in times of general or partial war, those cases in which his own subjects or alleged nonbelligerents complained of naval captors on account of alleged wrongful spoliation, illegal seizures, or other injuries. The royal council entertained, also, petitions of the captors for the condemnation of their prizes. The exercise of the latter jurisdiction accelerated the termination of disputes between captors on the one side and their fellow subjects or professed neutrals on the other; and, in the absence of any known dispute, quieted the titles of the captors. When the captures had incontestably been lawful, the condemnation was useful to the captor by extinguishing the right of postliminy, and thus converting his military title into a civil proprietary right. Subsequently, the council of state, retaining an appellate and revisory jurisdiction, delegated an original cognizance of prize cases to courts of admiralty, whose judges were lieutenants of the admiral. The probability that this jurisdiction of the admiral and his deputies had been to some extent exercised before the year 1297 will appear by comparing two reports of a case in that year of a vessel captured off the English coast, which are in Selden's note 18, to Fortescue, c. 32; and in Fritzherbert, Avowrie, pl. 192. Two cases mentioned in the Fœdera,—one in a document of 19th of July, 1343; the other, which was the case of The St. Salvador, in a document of 29th of April, 1357,—show that before the latter date the admiralty jurisdiction, in prize cases was fully established in subordination to that of the council, and that its exercise was regulated by a recognized international maritime law. Lord Mansfield has described the mode in which the jurisdiction was afterwards exercised in every war under a royal commission to the admiral, and a delegation by him authorizing the court of admiralty, and its lieutenant and judge and his surrogates, to hear and determine all cases of capture, prize, and reprisal of ships and goods, according to the course of the admiralty and the law of nations. 2 Doug. 614. Whether, without any such special commission, the jurisdiction in prize cases would have been to any extent exercisable by that court, under the general commission to the admiral and his ordinary delegation to the judge, is a question which the mode of organization of admiralty courts in the United States renders here unimportant. In whatever mode the jurisdiction may have been delegated in England to the admiral, and through him to his court, the royal council did not relinquish their optional right of exercising it themselves in the first instance, as before. Besides their appellate and an occasional supervisory jurisdiction, they still sometimes took original cognizance of those prize cases which involved important affairs

of state, particularly such as might complicate the diplomatic relations of the government. The council were partially relieved of this burden by two statutes,—one of the year 1353 (St. 27 Edw. III. 13); the other of 1452 (31 Hen. VI. c. 4),—which were interpreted in 1484 as together giving to the chancellor an original cognizance of complaints of maritime spoliations at the suit of either subjects or foreigners not hostile, and authorizing him to decide such cases with or without the assistance of any of the judges. But these acts did not exclude the council from a concurrent original jurisdiction. Letter in the Fœdera of 19th July, 1343, to the king of Aragon, cited above; Y. B., 2 Rich. III. fol. 2, pl. 4; 4 Inst. 152; 2 Bulst. 27; 3 Swanst. 603–606, 662, 664. See, also, 2 Vern. 592; 1 Ves. Sr. 98; 1 Eden, 130,—which three cases were, however, within the general equitable jurisdiction of the chancellor.

The rule of public law requiring a judgment of condemnation by a marine or prize court, as indispensable to the vesting of an ownership of confiscable hostile property in maritime captors, or in their government, has been established by the consent of nations, upon sound reasons of common interest. At what precise date this rule acquired its present absolute character is, perhaps, uncertain. To recur to the earliest indications of its recognition is not necessary. We find its observance prescribed and its reason explained in an English order in council proclaimed on 30th July, 1426, which is in the Fœdera, in the words, "that no goods captured in any manner whatever shall be distributed, disposed of or sold, at sea, or in any port or harbor, at which they may arrive, but shall be kept, without breaking of bulk, until the royal council or the chancellor of England, the admiral of England, or his deputy general for the time being, shall be certified and duly informed of the capture, that it may be known whether the captured goods are the property of enemies or friends."

This inquiry, whether the subject of capture is enemies' property, is always, in technical form, the question of confiscability in a prize court. We will see, presently, that, in the phraseology of prize law, the designation "enemies' property" has a most extensive technical meaning. Its applicability, in the language of prize courts, and in that of treaties or statutes, may sometimes be very different. Before considering the more enlarged meaning of the phrase, we may remark that in a foreign war a prize court never entertain the claim of a person residing in a hostile belligerent state as an alleged owner asking restitution of his captured property unless for some special reason which deprives it of a hostile character. Such an exemption from confiscability as is allowed in the case of a cartel, or of a licensed or privileged vessel or cargo, prevents the claimant from being, in a relative sense, an enemy. Except in such peculiar cases, no claim of any citizen or subject of an enemy's country can be received; and every resident of a hostile place or country is regarded, in such a court, as a citizen or subject. His property, when libeled, at the suit of the captors or their government, is condemned, without his being heard, as that of an enemy. Nothing remains to such a former proprietor but that hostile right of postliminy, or hope of recapture, called a mere scintilla juris, which every enemy retains until either confiscation or pacification. [The Adventure] 8 Cranch [12 U. S.] 226. A pacification terminates the right of postliminy, vesting in the captors or in their government, as against their late enemies, an absolute ownership of all captured property. Such property, unless the treaty of peace provides expressly for its restoration, may be subsequently condemned ([Jecker v. Montgomery] 18 How. [59 U. S.] 110), but cannot be restored to one who was, at the time of capture, an enemy. Thus, on a question of mere proprietorship, there can be no exercise of the jurisdiction of a prize court for the benefit of a party who, in respect of the captured property, is regarded as hostile, because the capture has produced, as between the belligerents, a complete divestiture of his former property. [The Adventure] 8 Cranch [12 U. S.] 226; [The Anne] 3 Wheat. [16 U. S.] 446; 6 C. Rob. Adm. 138; 1 Dod. 244, 245, 451.

In the technical, more extended, meaning of the phrase "enemies' property," as understood in prize courts, it includes everything captured at sea which is confiscable on account of its hostile character, or of its proprietor's absolute or only relative hostility. Sir William Scott said that property of enemies was "held, in construction and practice, to embrace all property liable to be condemned as prize"; adding that, " by fiction, or rather by intendment of law, all property condemned is the property of enemies,—that is, of persons so to be considered in the particular transaction." 5 C. Rob. Adm. 176. This phraseology needs no explanation where a subject of maritime capture is contraband of war. It is hostile, whatever may be its actual ownership. In language borrowed in part from Lord Greenville, "If I have wrested any enemy's sword from his hands, the bystander who furnishes him with a fresh weapon" is more than constructively hostile to me. Chief Justice Marshall exemplified the doctrine by the case of a search resisted (see 5 C. Rob. Adm. 176. and, in the Fœdera, the letter of 19th July, 1343, above cited) or of an attempt to enter a blockaded port, saying that, in such cases, "the laws of war, as exercised by belligerents authorize a condemnation as enemy's property, however clearly it may be proved that the vessel is, in truth, the vessel of a friend ([Maley v. Shattuck] 3 Cranch [7 U. S.] 488)." The latter example is one of property only constructively hostile.

Judge Story, in delivering an opinion of the

supreme court, said: "By the general law of prize, property engaged in an illegal intercourse with the enemy is deemed enemy property. It is of no consequence whether it belong to an ally or to a citizen. The illegal traffic stamps it with the hostile character." [The Sally] 8 Cranch [12 U. S.] 384. See [Jecker v. Montgomery] 18 How. [59 U. S.] 114. Judge Washington, in the circuit court, said that in England, almost as far back as the decisions of the prize court could be traced, the property of a subject engaged in trading with enemies had been considered as enemies' property, and the owner pro hac vice as an enemy. The Tulip [Case No. 14,234]. This had previously been the language of Sir William Scott (1 C. Rob. Adm. 219, 220), and nearly the same language was afterwards used again by Judge Washington, in the supreme court in the case of The Venus, already cited ([The Venus], 8 Cranch [12 U. S.] 253). That and other decisions which have been mentioned show that, in the case of persons owing allegiance to the government in whose prize court their captured property is prosecuted as hostile, the applicability of the designation, "enemies' property," may be independent of the question whether they are traitors to their government. A learned admiralty judge said that the same conveyance of intelligence to enemies which would hang a spy would condemn a vessel. Stew. Vice Adm. 494. Here he had in view the law martial, rather than the law of treason. But, in the United States as in England, persons owing allegiance to the government are guilty of treason when they furnish or attempt to furnish enemies of the government with intelligence or supplies which may be useful in war. Such persons, however, by the law of England, though guilty of a misdemeanor, commit an offense of no higher grade when they engage in commercial intercourse of any kind with enemies. 2 Rolle, Abr. 173, "Guerre," L, pl. 3; 16 Vin. Abr. 598, 599; 12 State Tr. 789, 799, 809, 811; Lord Hardwicke's note, mentioned in 1 Durn. & E. [1 Term R.] 85; 8 Durn. & E. [8 Term R.] 550; 25 State Tr. 1426. And see The Elizabeth of Ostend, 1 C. Rob. Adm. 202, 203. During the last war with England, three acts of congress, of which one is expired and the others repealed, were passed in order to make specific offenses under this head indictable in courts of the United States. 2 Stat. 778; 3 Stat. 84, 195, 226. Judge Washington remarked, with reference to the jurisdiction of English tribunals, that a prize court would treat the property of a subject engaged in maritime trade of either kind as the property of an enemy, but "the common law courts would treat him personally as a traitor, or as guilty of a misdemeanor, as the case might turn out." The Tulip [supra].

We have seen that the local residence of a party may, in a case in which he would otherwise be thus guilty of a mere misdemeanor,

exempt him altogether from legal criminality. See 6 C. Rob. Adm. 408; [The Venus] 8 Cranch [12 U. S.] 280. But in this, as in the two former cases, his property engaged in the trade is, in a prize court, confiscable as enemy's. During a civil war against an established government, the phrase "enemies' property," as understood in prize courts of this government, includes all property captured at sea which is actually or constructively hostile. During the civil war in Portugal between the queen and Don Miguel, she established a blockade of ports along the coast of her own kingdom. In a case already cited, the supreme tribunal of marine, at Lisbon, having condemned as prize a vessel of English ownership which had been captured for attempting to break the blockade and supply Don Miguel's adherents with warlike stores, it was held by a British court, in the year 1836, that the judgment of the Portuguese prize court, whether on the ground of an attempted breach of blockade, or on that of an attempted supply of contraband goods, was conclusive proof that the vessel was owned by enemies of the queen of Portugal, though Portugal was not then at war with any foreign government. 3 Scott, 202, 203, 228; 2 Bing. N. C. 781–783, 798.

Whether in the phrase "public enemies," used in this libel, the word "public," might not alter the effect otherwise attributable to the word "enemies," is a question which need not be considered, because the words "insurgents" and "traitors" are also used. But I doubt whether the point would have been important if these words had been omitted. In the case of The Adeline, 9 Cranch [13 U. S.] 283, 286, property captured in a public foreign war was libeled as enemies', when the case, as to part of it, was one of salvage only. The court thought there was no sufficient objection to a decree for salvage as to this part, and that if the objection could have been sustained it would have resulted only in a remand of the cause that the libel might be amended. The present libel, as it stands, must have the same effect as if it had simply averred that the property in question was lawful prize. This, without any special allegations, would have sufficed. 1 Dod. 82, 83; 2 Wheat. Append. [15 U. S.] 19. In the case of The Adeline, the court said that no proceedings can be more unlike than those in the courts of common law and in the admiralty, and that this is especially true in prize causes. 9 Cranch. [13 U. S.] 284.

We may here apply to prize cases arising upon maritime captures during a civil war the remark which, with a different application, has been already made and explained, that phraseological distinctions in the common law as to treason do not regulate or control the proceedings in this court against the captured property, or affect the question of its confiscability. Here two cases are to be considered,—the first that of property actually hostile, from its character or that of its own-

ers; and the second, that of property constructively so from the residence of its owner at a place in hostile occupation.

The first case is, I suppose, undisputed where the property is from its character directly hostile, as where it is contraband of war. There is quite as little reason to dispute the confiscability of the property of persons engaged in traitorous hostilities, or their adherents, though it be not contraband of war. Such property is confiscable even in the case of a mere insurrectionary rebellion or unorganized war. In the distinctions of the English law, between confiscations for certain specific treasons and for mere felonies, we may perceive the recognition of a principle from which the rule may be deduced. In the Bishop of Durham's Case (A. D. 1327), the forfeiture, in cases of treason, is called forfeiture of war (1 Hale, P. C. 255, 256), and Sir E. Coke mentions a decision of Fineux, C. J., in the reign of Henry VII., that if the chief justice of the king's bench, who is the supreme coroner of all England, in person, upon the view of the body of one killed in open rebellion, records it and returns the record to his own court, the lands and goods of the deceased traitor shall be forfeited, though he never was attainted, 4 Coke, 57b; 4 Bl. Comm. 382.[3] But our present concern is with authorities on cases of maritime capture. Judge Dunlop has, in a recent case, informed us that, on examination of the writers on public law, he does not find any difference as to belligerent rights in civil or foreign war. One of the purposes of a French ordinance of 8th

[3] In this reign, the jurisdiction of the court of the constable and marshal of England was still exercisable. The extent of this jurisdiction, which originated, like that of the admiral's court, in a royal delegation of authority, was defined in a declaratory statute of the year 1389. This act was intended to prevent incroachments of the constable's court beyond the bounds of its legitimate former jurisdiction. The case of Haulce v. Rosque (about A. D. 1393), mentioned in the note to 2 Knapp, 150, shows that this jurisdiction included controversies arising from the capture of booty on land in a foreign war. The statute indicates that the jurisdiction was also exercisable during war within the realm. The statute declared "the power and jurisdiction of the said constable in the form that followeth: To the constable it pertaineth to have cognizance of contracts touching deeds of arms and of war out of the realm, and also of things that touch war within the realm, which cannot be determined nor discussed by the common law with other usages and customs to the same matters pertaining, which other constables heretofore have duly and reasonably used in their time." St. 13 Rich. II. c. 2. Unless the application of the latter words must be limited to cases in which the realm was invaded by foreign enemies, which perhaps cannot be demonstrated, the language bears upon the present question, because the admiral cannot then have had a less extensive jurisdiction as to things "done upon the sea," arising from "war within the realm." His jurisdiction, whatever may have been its legitimate extent, did not afterwards, like the constable's, became obsolete. The references in this note might, possibly, through a more extended research, be so compared with other discoveries, as to elucidate the point in question.

August, 1582, was to ascertain the sense in which the phrase "enemies of the king" had been used in the articles on prize jurisdiction in previous admiralty ordinances. The prior ordinances of 1373 (usually cited as of the year 1400. See, as to its date, Pard. Coll. IV. 224), of 1517, and of 1543 may be found unabridged in Fontanon's collection. A comparison of them with the ordinance of 1582 would show that the phrase had been intended to include both rebels or enemies in civil wars, and hostile opponents against whom reprisals or partial war had been authorized. In the Black Book of the English admiralty, the articles under the heads "C" and "D" exhibit so many instances of attempts to usurp jurisdiction that I would not cite any of them if they had not been frequently quoted by admiralty judges in the United States and in England as of authority. In this book articles D, 1–18, inclusive, are those admiralty usages which an inquisition of the year 1375 reported as proper for future observance. Articles D, 19–81, are precepts for admiralty inquisitions without the returns. Those numbered D, 19–40, were probably issued between the years 1375 and 1378, and the subsequent articles, to D, 81, probably not later than 1389. Article D, 20, directs inquiry to be made concerning all those who victual or refresh any of the enemies of the king, or the rebels of Wales, with any manner of victuals, artillery, armor, corn, salt, iron, steel, or any other thing by which they are helped or strengthened. Article D, 31, directs inquiry to be made concerning all those who receive and keep in their ships any goods or chattels of any man attainted for treason, without rendering the same to the king, or to the admiral or his lieutenant, for the king. And article D, 58, directs inquiry to be made of all who sustain or receive in their ships any men outlawed or banished, or their goods or chattels. At the time of the Duke of Monmouth's rebellion, in 1685, the goods of rebels which were captured at sea appear to have been condemned in England as prize, in the court of admiralty. Hay & M. 47, 48. This occurred, likewise, at the rebellion of 1715. A case of The Duke de Véndome, determined in 1716, was cited by Sir George Hay. Id. 47. The dispute was not as to the confiscability of the captured property, but whether it belonged, when condemned, to the king or to the admiral. Other prize cases of the same kind were similarly adjudged after the rebellion of 1745, when there was no act of parliament on the subject, though there was legislation to facilitate prosecutions for treason in courts of common-law jurisdiction. Id. 47. See St. 19 Geo. II. c. 9.

It remains to consider cases of property condemned as hostile merely from the residence of its owner at a place or in a district which is in hostile occupation during civil war. Cases of this kind occurred in the civil wars already mentioned between Spain and the United Netherlands, and between Eng-

land and the United States. There was this difference between the two wars. The United States, from the commencement of hostilities, even before the declaration of independence, until the termination of the war, considered all trade or intercourse with England unlawful, and treated it as intercourse with enemies. See 16 Johns. 473, 474. The Netherlands, in the outset of their contest with Spain, prohibited their subjects from furnishing her with warlike supplies, but until 4th April, 1586, did not prohibit commercial intercourse of all kinds. An absolute prohibition of all trade with Spaniards was contained in an edict of this date, followed, on the 18th of July, 1586, by one of like effect. But by another edict of the 4th of August, 1586, the effect of the two former edicts was restrained so as only to forbid trading with such places in Belgic territory as were in Spanish possession. These differences did not affect differently the course of Spain and England as to captured property of residents in the revolted provinces. The preamble of the Dutch edict of the 4th of April, 1586, stated that the kings of Spain had already confiscated Belgic vessels, both in Spain and Portugal, and that there was reason to expect other naval captures and confiscation. In the reference to the confiscations which had already occurred the Dutch word rendered in the translation furnished me by the word "confiscate," is in Bynkershoek, "publicasse," which Mr. Duponceau translates condemned and sold. Bynkershoek must have understood the confiscations as having been judicial; and he mentions them without questioning their propriety. Bor. II. 703, Bynk.; de Reb. Bel., c. 3; Dup. p. 12; 3 Hall, Law J.

In England, soon after the commencement of the hostilities on this continent which preceded our declaration of independence, a statute (16 Geo. III. c. 5) was passed which, in its first and second sections, was in the form of a declaratory law. In this particular the effect of its enactments has been misunderstood by some of those who have cited it. The first section, after stating that many persons in the colonies had set themselves in open rebellion and defiance to the authority of the government of England to which they were subject, and had assembled an armed force, engaged the king's troops, and attacked his forts, had usurped the powers of government, and prohibited all trade and commerce with his dominions, for the more speedy and effectual suppression of their designs, and preventing any supplies or assistance from "being sent thither during the continuance of the said rebellions and treasonable commotions," declared and enacted that all manner of trade and commerce was and should be prohibited with the colonies, naming them, and that all ships and vessels of or belonging to their inhabitants, with their cargoes, etc., trading in, or going to, or coming from trading in, any

port or place of the said colonies, should be forfeited, as if they were the ships and effects of open enemies, and should be so adjudged in all courts of admiralty and other courts. The latter provision was a mere declaratory continuance of the restrictions and penalties which had previously secured the British monopoly of the colonial trade. The declaratory form of the whole section shows that the ships of all inhabitants of the colonies and their cargoes would, in the opinion of the British parliament, have been confiscable without any legislation upon the subject. See the opinion of Tilghman, O. J., quoted in a former note. The second section, which was also in its form declaratory, provided for a limited exemption of vessels trading for specified purposes, under British licenses, from confiscation. The remaining sections were not declaratory. They were, in part, intended to remove difficulties as to the rights of captors, by placing their prizes on the footing on which other statutes had placed prizes captured in foreign wars. In the reported decisions of the English admiralty court during this war, the successive judges exhibited each a strong desire to find reasons for exempting from confiscation the captured property of persons residing in the United States who adhered to the British cause. In the case of a foreign war, an English subject leaving the enemy's country at the commencement of hostilities, and bringing with him property owned by him before the war, had, in prior cases, been indulged by a limited exemption of the property thus brought with him from confiscability. But this exemption had not been extended to goods brought with him for trading purposes, or even to goods which would otherwise have been exempt if they came in another vessel. The captured property of the American loyalists who were on their way to England was exempted. Sir George Hay was inclined to go farther and exempt the captured property in all cases, unless its owners were proved to have been concerned in some act of rebellion. Hay & M. 46. But he never made any such decision, and both he and Sir James Marriott, who succeeded him, condemned all the property of loyal inhabitants of the United States except that which they brought over with them in the same vessel in which they came. Id. 212. And see pages 4, 78, 80, 94, 95, 83, 216.

Upon the reasons which have been stated, and authorities reviewed, this vessel should be condemned as prize. But it is objected that congress had not legislated upon the existing war; that the president alone had directed and regulated the prosecution of hostilities; and that, when this vessel was captured, he had not ordered any other captures than for breach of blockade. These objections are insufficient. Any nation may be involved in a war which has not been declared, and as to which her government

has not legislated. Judges of English prize courts have agreed with Bynkershoek in the opinion, which publicists no longer dispute, that the legal consequences of an actual war must be the same, whether it has or has not been formally declared. The only modern intimations of a contrary opinion as to a foreign war are in Stew. Vice Adm. pp. 304, 414, which I consider as overruled in 1 Dod. 247. See Hay & M. 252, 253.

In the course of the argument partial war with a foreign state seems to have been somewhat confounded with informal war. A partial war may be informal, or may be more or less, or quite, formal. But the present inquiry does not involve any distinctive doctrines of public law concerning partial war. Therefore, the cases which arose under acts of congress authorizing the limited hostilities prosecuted against France at the close of the last and commencement of the present century, may be dismissed from consideration. In 1846, when congress was in session, the United States were involved in a general war which was informally begun. The war which Mexico had for some time threatened then broke out suddenly Congress thereupon declared that, by an act of Mexico, a state of war existed between her government and the United States. If no such law had been enacted, there would, not the less, have been war with Mexico. The president must, then, as commander in chief of the army and navy, have directed its prosecution conformably to the rules of public law. This he must at all events have done, if congress had not been sitting when the Mexicans attacked our army. The case of a civil war is practically the same. The marshal of the United States, in order to keep the peace of his judicial district, and enable himself to execute the process of the courts, may arm himself and his deputies, and may also call in the aid of a warlike force. Y. B. 3 Hen. VII. pl. 1; 5 Coke, 72a; Br. Riots, pl. 2; Dall. c. 95; 8 Watts & S. 191; 5 Car. & P. 254, 282. When he cannot, by such means, keep the peace of his district, and the courts in it no longer can direct their process to him, a state of war exists. The president in such a case is required by the constitution to "take care that the laws be faithfully executed." While other officers only swear to support the constitution, his official oath, as prescribed in it, requires him "to the best of his ability" to "preserve, protect, and defend the constitution." Therefore, when hostilities actually waged against the constitution and laws assume the dimensions of a general war, he must prosecute opposing hostilities, offensive as well as defensive, upon such a proportional scale as may be necessary to re-establish, or to support and maintain, the government. But he cannot (see [Brown v. U. S.] 8 Cranch [12 U. S.] 126–129; [The Thomas Giffons] Id. 427; [The Nereide] 9 Cranch [13 U. S.] 422; Act Cong. March 3, 1799, c. 45 [1 Stat. 743];

Act Cong. March 3, 1813, c. 61 [2 Stat. 829]) make "rules concerning capture on land and water." The constitution has vested this power in congress. The president cannot prosecute hostilities otherwise than according to the directions of existing acts of congress or to the rules of public law. Without his orders an officer of the navy capturing this vessel would have performed a lawful act. Had the president forbidden her capture the officer might have been punishable for disobedience of orders, but the vessel should not for that reason be liberated by a prize court, if she was in law confiscable.

The claim is rejected.